IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBVIE INC. and WISCONSIN ALUMNI ) 
RESEARCH FOUNDATION, )
 )
          Plaintiffs, )
 ) C.A. No. 11-648 (GMS)
      v. ) (Consolidated)
 )
HOSPIRA, INC., )
 )
          Defendant. )

## ABBVIE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Derek J. Fahnestock (#4705)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
dfahnestock@mnat.com
   *Attorneys for AbbVie Inc.*

OF COUNSEL:

Michael A. Morin
David P. Frazier
Robert F. Shaffer
Krista E. Bianco
Shana K. Cyr
J. Derek McCorquindale
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001
(202) 408-4000

December 19, 2013

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II. BACKGROUND FINDINGS OF FACT:  THE CLAIMED FORMULATIONS
    ARE SELF-PRESERVED, STABLE, AND SOLUBILIZE PARICALCITOL ...............5

    A.  Discovery of the Zemplar® Formulation ..................................................5

    B.  The '799 Patent Teaches that the Claimed Formulations Solubilize
        Paricalcitol, Are Stable, and Are Self-Preserved ....................................8

    C.  The Person of Ordinary Skill in the Art ..................................................10

III. FINDINGS OF FACT RELATED TO INFRINGEMENT ............................................11

    A.  Hospira Copied an Embodiment from the '799 Patent ...........................11

    B.  Hospira Infringes Each and Every Element of the Asserted Claims ...................12

        1.  "A sterilized, self-preserved, aqueous pharmaceutical composition
            for parenteral administration" ..................................................13

        2.  "consisting essentially of a therapeutically effective amount of
            par[i]calcitol or calcitriol" ....................................................13

        3.  "about 50% (v/v) of an organic solvent selected from the group
            consisting of ethanol in the range of about 15% to about 30% (v/v)
            and PG in the range of about 20% to about 35% (v/v)" ..........................13

        4.  "about 50% (v/v) water" ........................................................16

        5.  Claims 8 and 9 ..................................................................16

    C.  Hospira's Renewed Claim Construction and Prosecution Disclaimer
        Arguments Conflict with the Evidence of Record ...............................16

IV. CONCLUSIONS OF LAW REGARDING INFRINGEMENT ......................................19

V.  FINDINGS OF FACT RELATED TO NONOBVIOUSNESS .....................................23

    A.  Hospira's Eleventh-Hour Defense ..........................................................23

    B.  Hospira's First Obviousness Combination—the '925 Patent in View of the
        Calcijex® Label and the Level of Skill in the Art—Lacks Merit ........................24

    C.  Hospira's Second Obviousness Combination—the '957 Patent in View of
        the '925 Patent Prosecution History or Malluche—Lacks Merit ........................26

D.     Fundamental Deficiencies in Hospira's Obviousness Theories ...........................28

E.     The Objective Evidence Supports a Finding of Nonobviousness .......................31

       1.     The Claimed Formulations Display Unexpected Synergy in Killing Microorganisms..................................................................................................31

       2.     Zemplar® Has Been Commercially Successful........................................33

       3.     Hospira Copied a Preferred Embodiment from the '799 Patent ...............35

VI.     CONCLUSIONS OF LAW REGARDING NONOBVIOUSNESS ...............................35

A.     Hospira's Flawed Obviousness Combinations ...................................................35

B.     The Claimed Invention Would Not Have Been Obvious Because the Prior Art Taught Use of Excipients Precluded by the Claims ......................................38

C.     Objective Evidence Confirms the Nonobviousness of the Claims ......................39

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AK Steel Corp. v. Sollac,*
    344 F.3d 1234 (Fed. Cir. 2003).................................................................................38

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,*
    750 F.2d 1569 (Fed. Cir. 1984) ...............................................................................38

*Aventis Pharmaceuticals Inc. v. Amino Chemicals Ltd.,*
    715 F.3d 1363 (Fed. Cir. 2013)...................................................................................3

*Baxter Healthcare Corp. v. Spectramed, Inc.,*
    49 F.3d 1575 (Fed. Cir. 1995)...................................................................................19

*Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.,*
    482 F.3d 1347 (Fed. Cir. 2007)................................................................................20

*Cohesive Technologies, Inc. v. Waters Corp.,*
    543 F.3d 1351 (Fed. Cir. 2008)..................................................... 1, 14, 20, 23

*Creative Integrated Systems, Inc. v. Nintendo of America, Inc.,*
    526 F. App'x 927 (Fed. Cir. 2013)...........................................................................22

*Crocs, Inc. v. International Trade Commission,*
    598 F.3d 1294 (Fed. Cir. 2010) ...............................................................................39

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
    851 F.2d 1387 (Fed. Cir. 1988) ...............................................................................40

*Eli Lilly & Co. v. Medtronic, Inc.,*
    496 U.S. 661 (1990) ................................................................................................20

*Eli Lilly & Co. v. Teva Pharmaceuticals USA, Inc.,*
    619 F.3d 1329 (Fed. Cir. 2010)................................................................................35

*Finjan, Inc. v. Secure Computing Corp.,*
    626 F.3d 1197 (Fed. Cir. 2010)................................................................................19

*Fromson v. Advance Offset Plate, Inc.,*
    755 F.2d 1549 (Fed. Cir. 1985)................................................................................35

*In re Wesslau,*
    353 F.2d 238 (C.C.P.A. 1965). ................................................................................35

*Invitrogen Corp. v. Biocrest Manufacturing, L.P.,*
    327 F.3d 1364 (Fed. Cir. 2003)..................................................... 3, 18, 21, 23

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997)......................................................................................40

*KSR International Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ......................................................................................................36

*Life Technologies, Inc. v. Clontech Laboratories, Inc.*,
224 F.3d 1320 (Fed. Cir. 2000)......................................................................................38

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ....................................19

*Microsoft Corp. v. i4i Ltd. Partnership*,
131 S. Ct. 2238 (2011) ..................................................................................................35

*Northern Telecom Ltd. v. Samsung Electronics Co.*,
215 F.3d 1281 (Fed. Cir. 2000)......................................................................................21

*Omega Engineering, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)........................................................................ 3, 18, 21, 23

*Ortho-McNeil Pharmaceutical, Inc. v. Caraco Pharmaceutical Laboratories, Ltd.*,
476 F.3d 1321 (Fed. Cir. 2007)................................................................................. 1, 20

*Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ......................................................................................39

*OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*,
701 F.3d 698 (Fed. Cir. 2012) ........................................................................................39

*Pall Corp. v. Micron Separations, Inc.*,
66 F.3d 1211 (Fed. Cir. 1995)................................................................................20, 23

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................................................................19

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*,
438 F.3d 1123 (Fed. Cir. 2006)......................................................................................22

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000)........................................................................................36

*SanDisk Corp. v. Memorex Products, Inc.*,
415 F.3d 1278 (Fed. Cir. 2005)......................................................................................21

*Sanofi-Synthelabo v. Apotex, Inc.*,
550 F.3d 1075 (Fed. Cir. 2008)......................................................................................37

*Santarus, Inc. v. Par Pharmaceutical, Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012)...................................................................36

*Specialty Composites v. Cabot Corp.*,
    845 F.2d 981 (Fed. Cir. 1988)...................................................................40

*Storage Technology Corp. v. Cisco Systems, Inc.*,
    329 F.3d 823 (Fed. Cir. 2003)...................................................................18

*Teva Pharmaceutical USA, Inc. v. Sandoz, Inc.*,
    876 F. Supp. 2d 295 (S.D.N.Y. 2012), *aff'd in relevant part*,
    723 F.3d 1363 (Fed. Cir. 2013)...................................................................40

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010)...............................................................4, 39

*Unigene Laboratories, Inc. v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011)...................................................................37

*Winner International Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000)...............................................................36, 40

## FEDERAL STATUTES

35 U.S.C. § 103(a) ...................................................................................37

35 U.S.C. § 271(e)(2)(A)...........................................................................20

35 U.S.C. § 282..........................................................................................35

# CITATION FORMS, ABBREVIATIONS, AND WITNESS TESTIMONY

Explanation of Citation Forms

| | |
|---|---|
| COL | A paragraph in AbbVie's Proposed Conclusions of Law |
| Dep. Tr. | Citation to deposition transcript submitted by video |
| FOF | A paragraph in AbbVie's Proposed Findings of Fact |
| Tr. | Citation to trial transcript (Tr. omitted if witness name is provided) |
| UF | A paragraph in the parties' statement of uncontested facts [D.I. 176, Exhibit A of Proposed Joint Pretrial Order, redacted version filed September 6, 2013] |
| Bold and/or italicized word | Unless otherwise indicated, emphasis was added for any bold and/or italicized word |

Abbreviations

| | |
|---|---|
| '799 patent | U.S. Patent No. 6,136,799 [JTX2] |
| '925 patent | U.S. Patent No. 5,246,925 [JTX34] |
| '957 patent | U.S. Patent No. 5,472,957 [DTX355] |
| AbbVie | Plaintiff AbbVie Inc. |
| FDA | U.S. Food and Drug Administration |
| Hospira | Defendant Hospira, Inc. |
| Hospira's paper NDA | New Drug Application No. 201-657 |
| PG | Propylene glycol |

Citations to Live Trial Testimony

| | |
|---|---|
| Coulombe | AbbVie's witness Christine Coulombe (Trial Day 1, pp. 58-86). A picture of Ms. Coulombe is included in Exhibit A. |
| Moreton | AbbVie's expert Dr. Christian Moreton (Trial Day 1, pp. 87-265) A picture of Dr. Moreton is included in Exhibit A. |
| Pinal | Hospira's expert Dr. Rodolfo Pinal (Trial Day 2, pp. 317-475) |

Citations to Deposition Trial Testimony

| | |
|---|---|
| Gibson | Hospira's witness Michael Gibson (Deposition testimony read during Trial Day 2, pp. 270-293) |
| Li | AbbVie's witness Dr. Lukchiu Li (Deposition testimony submitted by video) |
| Pec | AbbVie's witness Edward Pec (Deposition testimony submitted by video) |
| Giles | Hospira's witness David Giles (Deposition testimony read during Trial Day 2, pp. 293-304) |
| Beckhorn | Hospira's witness Amy Beckhorn (Deposition testimony read during Trial Day 2, pp. 312-313) |
| O'Brien | Hospira's witness Sharon O'Brien (Deposition testimony read during Trial Day 2, pp. 304-311) |

## I.      INTRODUCTION

1.      This case is about AbbVie's invention of a new and improved pharmaceutical formulation that is (1) self-preserving, (2) stable, and (3) capable of effectively solubilizing the Vitamin D compounds paricalcitol and calcitriol—without the use of other excipients.  This novel formulation was a significant improvement over the prior art, which relied on the addition of antimicrobial preservatives or other excipients in order to obtain the desired preservative effects, and is claimed in asserted claims 7-9 of the '799 patent.

2.      The evidence at trial establishes that, at the inception of its paricalcitol program, Hospira *studied* the '799 patent and then, when its efforts to design around the patent failed, *copied* a preferred embodiment.  And the evidence further establishes—as one would expect in view of Hospira's copying—that Hospira's product infringes.

3.      Hospira has only one argument to the contrary.  Specifically, Hospira argues that its proposed formulation falls outside the claimed ranges for ethanol and PG.  But that argument gives short shrift to the use of the key term "about" in the claims.  The Federal Circuit has explained that "[i]n determining how far beyond the claimed range the term 'about' extends the claim, '[courts] must focus . . . on the ***criticality*** of the [numerical limitation] to the invention.'" *See, e.g.*, *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008) (third alteration in original) (quoting *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327 (Fed. Cir. 2007)).  The logic behind this reasoning is simple:  critical limitations should be construed narrowly, while less critical limitations should be construed broadly.  *Id.*

4.      Importantly, the '799 patent expressly teaches that "the ratio of ethanol and PG is ***not critical*** to the self-preserving properties" of the claimed cosolvent formulations, meaning that "about" should be interpreted broadly.  [JTX2, col. 6, ll. 65-67.]  It also ***expressly sets forth***

1

Hospira's formulation as a preferred embodiment (Figure 6), and relies on that embodiment in concluding that the ratio of ethanol and PG is ***not critical***.

5.    Consistent with this evidence of infringement, Hospira has repeatedly represented to the FDA and its customers that its product is the same, or essentially the same, as AbbVie's Zemplar® product, which the parties stipulated is covered by the asserted claims.  [UF ¶ 52; Moreton 94:15-22; Pinal 410:1-3.]  Hospira told the FDA that the ratio of ethanol and PG in its proposed formulation was only a "***slight modification***[]" from the patented Zemplar® product, and explained that this slight change did not impact solubility.  [JTX13 at 5.]  Hospira told customers that it "replicated the Zemplar formulation other than ***slight changes*** in the concentration of propylene glycol and alcohol."  [PTX252 at 4.]  Hospira told customers that its formulation was "***not that different***" than Zemplar.  [PTX45 at 1.]  Hospira even represented to the FDA that its proposed product "***contains the same*** active and ***inactive ingredients in the same concentration***" as Zemplar®.  [PTX73.]

6.    Against this overwhelming evidence of infringement, Hospira essentially recycles its failed claim construction arguments, arguing that, in view of Table 1 of the '799 patent, "about" should be confined to "minor variations."  But the Court *already rejected* that argument, explaining that "[t]he specification fails to link the minor numerical variations displayed in Table 1 . . . to the term 'about' in Claim 1."  [D.I. 168 at 2 n.1.]  Instead, as the Court observed, "the written description explicitly provides that 'the ratio of ethanol and [propylene glycol] is not critical to the self-preserving properties of [the] cosolvent formulation.'"  [*Id.*]

7.    Hospira also repeats its failed argument that AbbVie disclaimed Hospira's proposed formulation during prosecution of the '799 patent.  Specifically, Hospira focuses on a single sentence of the prosecution file, arguing that because the inventors referenced Figures 1-5,

but not Figure 6 when referencing unexpected antimicrobial synergy, Hospira's product must fall outside of the claims.  But that argument not only ignores the prosecution history as a whole, it also ignores controlling law, which requires any alleged disclaimer to be clear and unambiguous. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003); *see also Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1375 (Fed. Cir. 2013) (restrictive construction should not be used unless "specifically disclaimed during prosecution").

8. "[C]onstruing a claim to exclude a preferred embodiment," as Hospira seeks to do, "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (citation omitted). Hospira's effort to exclude the 40% (v/v) ethanol, 10% (v/v) PG embodiment based on a failure to mention Figure 6 in a single sentence of the file history fails to meet this standard.

9. Hospira's obviousness allegations are equally flawed.  After studying the '799 patent for nearly a year, Hospira's Intellectual Property Director concluded that Hospira had "*no credible invalidity attack*." [PTX224 at 1.]  Similarly, in 2008, *after* reviewing the '799 patent, Hospira's lead formulator doubted that the claimed formulations would be self-preserving, discrediting Hospira's argument that, a decade earlier, those of *ordinary* skill would have expected otherwise.  Even after three additional years of study, Hospira *still* did not have an invalidity position when it filed its Paragraph IV notice letter on June 7, 2011.  [PTX182.]  Nor did it include an invalidity assertion in its Answer, filed several months later.  [D.I. 7.]  In fact, it took Hospira more than four years to assert any obviousness defense whatsoever, and more than five years to come up with its ultimate position, on the eve of trial.

10. There is a reason why Hospira recognized that it had "no credible invalidity attack" and took more than five years to come up with its current position:  the claims simply are

not obvious.  As AbbVie demonstrated at trial, Hospira's entire position rests on impermissible

hindsight.  Perhaps this was because Hospira provided its expert with its invalidity contentions

*before* he formed his opinion.  [Pinal 401:14-17.]  After all, many inventions appear obvious in

retrospect, once the solution is known.  That is why it is important to look at the actual

contemporaneous evidence from the time of the invention.  Here, that evidence establishes that

(1) none of the asserted references disclose cosolvent formulations for Vitamin D compounds

containing ethanol, PG, and water, let alone at the claimed concentrations; (2) solubilizing water-

insoluble compounds such as paricalcitol was both unpredictable and difficult; (3) people skilled

in the art would not have turned to cosolvents to solubilize therapeutic Vitamin D compounds;

and (4) even if they did, they would have followed conventional wisdom by adding extra

excipients.

      11.     Separate and apart from these deficiencies, Hospira's position fails as a matter of

law, because it ignores the objective evidence of nonobviousness.  "Our case law is clear that

[objective evidence of nonobviousness] 'must be considered in evaluating the obviousness of a

claimed invention.'"  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA,*

*Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) (citation omitted).  Hospira's expert did not even

consider the commercial success of Zemplar[®] or the substantial evidence of copying, even

though Hospira seeks to market an exact copy of AbbVie's preferred embodiment.  Hospira's

expert attempted to explain away the evidence of unexpected synergy by citations to papers from

journals involving food safety (rather than pharmaceuticals), but did not cite a single paper that

would support his alternative testing methodology, much less any evidence that could begin to

explain the ***100,000-fold*** increase in mold killing discovered by the inventors.  Moreover,

although it was Hospira's burden to prove invalidity (by clear and convincing evidence), its

expert did not perform a single experiment using his novel proposed testing methodology.

12.     Hospira had it right when it told the FDA and its customers that its proposed

product is the same or essentially the same as AbbVie's patented Zemplar® product.  Hospira's

IP Director had it right when he determined that Hospira had "no credible invalidity attack."

AbbVie respectfully submits that the trial record as a whole demonstrates that (1) Hospira

infringes the '799 patent, and (2) the asserted claims are not invalid for obviousness.

## II.     BACKGROUND FINDINGS OF FACT:  THE CLAIMED FORMULATIONS ARE SELF-PRESERVED, STABLE, AND SOLUBILIZE PARICALCITOL

### A.     Discovery of the Zemplar® Formulation

13.     AbbVie's Zemplar® product[1] was approved in 1998 for the prevention and

treatment of secondary hyperparathyroidism associated with chronic kidney disease Stage 5.

[UF ¶ 7-8; JTX142 at 10; Coulombe 60:18-61:11.]  The active ingredient in Zemplar® is the

Vitamin D compound paricalcitol, discovered by Dr. Hector DeLuca at the University of

Wisconsin.  [UF ¶ 9; Coulombe 65:13-21.]

14.     Prior to Zemplar®'s approval, only one other injectable Vitamin D product,

Calcijex®, had been approved by the FDA.  [Moreton 150:15-17.]  The active ingredient in

Calcijex® is calcitriol.  [Moreton 99:25-100:1.]

15.     Relative to Calcijex®, Zemplar® has a favorable side-effect profile and can be

given to a broader range of patients.  [Coulombe 64:19-65:6.]  Zemplar® administration reduces

the hospitalizations of patients on dialysis, reduces the number of days in the hospital, and yields

improved survival rates.  [Coulombe 64:19-65:6.]

---

[1] AbbVie Inc. is the successor-in-interest to Abbott Laboratories' proprietary pharmaceutical division after Abbott split into two companies on January 1, 2013.  [Coulombe 59:9-16.]

16.     Neither calcitriol (the active ingredient in Calcijex®) nor paricalcitol (the active ingredient in Zemplar®) is soluble in water.  [Moreton 96:3-8, 99:22-24.]  Because poor solubility can impact both safety and efficacy, commercial formulations use inactive ingredients, called "excipients," to solubilize these active ingredients.  [Moreton 92:21-23, 96:9-97:1.]

17.     The prior art Calcijex® formulation used the surfactant Polysorbate 20 (also called Tween® 20) to solubilize calcitriol.  [JTX254 at 3; Moreton 99:22-24, 261:23-262:5; Pinal 404:22-405:2, 406:10-17.]  Other excipients in Calcijex® included an antioxidant to prevent oxidation of the active ingredient, buffering agents to regulate the pH of the formulation, and a chelating agent to remove metal ions.  [JTX254 at 3; *see also* Moreton 97:6-98:5.]

18.     An advantage of the Calcijex® formulation, and surfactant use in general, is that it maximizes the water content in the formulation.  [Pinal 405:24-406:9.]  Because water is the fluid used by the body, formulators prefer a high water content in an injectable formulation.  [Moreton 151:11-19; Pinal 406:3-6; Gibson 280:3-8.]

19.     Other contemporaneously developed Vitamin D formulations for parenteral injection, such as Hectorol® and Oxarol®, although not prior art, also use the surfactant Polysorbate 20 to solubilize the active ingredient.  [PTX752 at 1; PTX755 at 2; Moreton 155:13-156:12, 156:17-24; Pinal 410:9-12, 411:11-16.]  Every injectable Vitamin D product of record, other than Zemplar®, uses surfactants to solubilize the drug.

20.     When the inventors of the '799 patent began to develop a formulation for paricalcitol, they too initially used the surfactant Polysorbate 20.  [Li Dep. Tr. 38:2-10, 38:15-18, 40:4-13; Pec Dep. Tr. 44:2-8, 45:7-10, 64:21-65:4.]  But Polysorbate 20 did not result in adequate paricalcitol solubility.  [Pec Dep. Tr. 65:12-14.]

21.     The inventors next investigated the use of excipients called cosolvents.  [Pec Dep. Tr. 67:1-5.]  Specifically, in early 1995, the inventors conducted a solubility study evaluating eight different formulations containing various concentrations of ethanol, PG, and/or water. [JTX74.]  Based on this study, the inventors selected a formulation containing 20% (v/v) ethanol, 30% (v/v) PG, and 50% (v/v) water for further development, in part because it effectively solubilized paricalcitol without requiring additional excipients.  [Li Dep. Tr. 64:22-65:1, 66:2-10, 66:13-14, 66:24-67:8; JTX74.]  The inventors also determined that paricalcitol dissolved in this formulation was stable—again without additional excipients.  [Moreton 102:19-25.]

22.     The 20% (v/v) ethanol, 30% (v/v) PG, 50% (v/v) water formulation has been used in Zemplar® since its approval in 1998, as well as in the multi-dose form of Zemplar® since its approval in 2011.  [UF ¶¶ 8, 10; JTX142 at 4; Coulombe 66:18-22.]

23.     In August 1997, the inventors designed a series of experiments to evaluate microorganism growth in the Zemplar® formulation as well as other formulations containing ethanol and/or PG.  [JTX294 at 1-4.]  To evaluate microorganism growth, the inventors used the preservative effectiveness test described in the United States Pharmacopoeia 23-National Formulary 18 (USP 23-NF 18) ("the USP test").  This test measures the killing of certain species of bacteria, yeast, and mold over a 28-day period.  [Moreton 103:15-104:16.]

24.     As detailed in the '799 patent and discussed in FOF 33-37 below, the Zemplar® formulation not only passed the USP test, but demonstrated remarkable and unexpected synergistic results, in that the combination of ethanol and PG was ***much more*** efficacious than the sum of the individual efficacies.  [Moreton 108:2-109:1, 109:8-111:2.]  This remarkable synergy was particularly apparent in killing mold, with a 100,000-fold increase over the predicted value after seven days.  [Moreton 110:2-10.]

25.     Mold contamination is a serious concern for injectable pharmaceuticals. [Moreton 111:3-7.]  Use of a contaminated solution can lead to septicemia (bloodstream infections), and even septic shock, which is life-threatening.  [PTX552; Moreton 111:8-112:13.]

**B.     The '799 Patent Teaches that the Claimed Formulations Solubilize Paricalcitol, Are Stable, and Are Self-Preserved**

26.     U.S. Application No. 09/057,143, which issued as the '799 patent, was filed on April 8, 1998, shortly after the inventors obtained the surprising results of the preservative effectiveness tests.  [UF ¶ 46; JTX5 at 3; Pinal 441:20-442:5.]  It is undisputed that AbbVie is the owner of the '799 patent and has standing to assert it.  [UF ¶¶ 44-45; Tr. 314:8-20.]

27.     The '799 patent explains that formulations containing ethanol, PG, and water are self-preserved, stable, and solubilize paricalcitol, *without* the need for excipients such as surfactants, antioxidants, buffers, pH adjusting agents, chelating agents, and preservatives. [Moreton 98:6-10, 101:9-102:25.]

28.     The '799 patent explains that "[t]he present invention provides a formulation that requires no antioxidant, contains no additives that would lead to an increase in the levels of aluminum in the formulation, and may be terminally sterilized."  [JTX2, col. 1, ll. 37-40; Moreton 98:11-24; *see also* JTX2, col. 3, ll. 54-61.]  Buffers and chelating agents are identified as excipients that may increase levels of aluminum (a hazard for patients on dialysis).  [JTX2, col. 1, ll. 18-25; Moreton 98:25-99:2.]  The '799 patent further states that "the formulations of the present invention omit the use of surfactants, which can cause irritation at the site of injection in some patients."  [JTX2, col. 3, ll. 52-54; Moreton 99:3-12.]

29.     In characterizing the need for excipients, the '799 patent concludes as follows: "While buffers, surfactants and additional excipients may be added to the present formulation,

such additional components are not critical to achieve the self-preserving feature or to maintain the stability of the therapeutic agents therein." [JTX2, col. 3, ll. 61-65; Moreton 100:16-101:12.]

30.     As summarized by Hospira's expert, Dr. Pinal, the '799 patent "criticizes" the use of surfactants, "criticizes" the use of antioxidants, and states that "you don't want to add" buffers. [Pinal 405:3-5, 407:15-16, 411:6-10.]

31.     Example 1 of the '799 patent, titled "Solubility of Par[i]calcitol in a Cosolvent System," discloses the inventors' solubility study measuring the concentration of paricalcitol in various formulations of ethanol, PG, and water. [JTX2, col. 5, ll. 4-30; Moreton 101:13-102:1.] The study shows that within certain parameters, these formulations effectively solubilize this otherwise poorly soluble drug. [Moreton 102:2-11.]

32.     Example 2, titled "Stability of Par[i]calcitol in a Cosolvent Formulation," demonstrates that paricalcitol is very stable in a cosolvent formulation of 20% (v/v) ethanol, 30% (v/v) PG, and 50% (v/v) water. [JTX2, col. 5, l. 31 to col. 6, l. 8; Moreton 102:12-25.]

33.     Example 3, titled "Self-preserved Cosolvent Formulations," discloses the results of the inventors' preservative effectiveness tests. Figures 1 and 2, respectively, show the test results for a 20% (v/v) ethanol formulation and a 30% (v/v) PG formulation. [Moreton 106:2-7.] Both formulations showed limited or no mold killing at any point. [Moreton 106:8-14.]

34.     Figures 3 and 4, respectively, show the predicted and actual preservative effectiveness for a 20% (v/v) ethanol, 30% (v/v) PG formulation. [Moreton 108:5-13.] Consistent with established prior art methods, the predicted value was calculated by adding the 20% (v/v) ethanol and 30% (v/v) PG data reported in Figures 1 and 2 [Moreton 108:14-21, 163:19-25]. Surprisingly, however, the actual preservative effectiveness turned out to be far greater than expected. [Moreton 109:8-111:2.] This "synergistic" behavior is easily seen when

comparing the actual and predicted mold levels—while one would have predicted a less than ten-fold reduction, the mold is reduced more than 100,000-fold (and in fact eliminated) within seven days. [Moreton 108:14-109:1, 109:8-111:2.]  A synergistic effect was also observed at day zero for the yeast *C. albicans* as well as the bacteria *E. coli* and *S. aureus*.  [Moreton 109:18-110:1.]

35.     Figures 5 and 6 respectively show the results of preservative effectiveness tests for a 30% (v/v) ethanol, 20% (v/v) PG formulation and a 40% (v/v) ethanol, 10% (v/v) PG formulation.  [Moreton 112:17-24.]  The results are strikingly similar to the results shown in Figure 4, including the complete elimination of mold by day 7.  [Moreton 112:25-113:14.]

36.     Collectively, these results demonstrate that the ratios of ethanol and PG are not critical to the performance of the formulation.  [Moreton 113:15-20.]  This is expressly reported in the '799 patent, which states that "FIGS. 5 and 6 [the Hospira formulation] demonstrate that the ratio of ethanol and PG is ***not critical*** to the self-preserving properties of this cosolvent formulation."  [JTX2, col. 6, ll. 65-67; Moreton 113:21-114:5.]

37.     The inventors recognized that these unexpected properties would be particularly beneficial for multi-use dosage forms, stating that "a further advantage provided by the formulations of the present invention is in the ability to package therapeutic agents in packaging, e.g., vials, which are suitable for multiple use."  [JTX2, col. 4, ll. 32-35; Moreton 169:1-13.]

**C.     The Person of Ordinary Skill in the Art**

38.     The person of ordinary skill in the art for the '799 patent would have a Ph.D. degree in chemistry, biochemistry, pharmaceutics, pharmacology, or the biological sciences and at least two years of experience in developing pharmaceutical compositions for parenteral administration.  [Moreton 122:15-24.]

39.     While Hospira proposed a slightly different definition, the parties agree that the differences are not outcome determinative on any issue.  [Moreton 123:3-6; Pinal 325:3-12.]

## III.    FINDINGS OF FACT RELATED TO INFRINGEMENT

### A.    Hospira Copied an Embodiment from the '799 Patent

40.    Hospira reviewed the '799 patent prior to beginning work on its paricalcitol product.  [Gibson 273:19-275:1, 275:8-24, 292:20-293:10; Giles 294:6-21, 298:2-10.]

41.    Based on this review, Hospira's lead formulator, Michael Gibson, determined that Hospira should add additional preservatives and antioxidants relative to the Zemplar® formulation because "inclusion of any additional ingredient [to the Zemplar® formulation] takes the formulation outside the scope of the ['799 patent."  [JTX23 at 7-8; Gibson 270:8-271:6, 273:19-274:16, 276:24-277:16; Moreton 117:2-118:5, 118:15-20.]

42.    The chart below is contained in Hospira's paper NDA.  Formulation 1 is the Zemplar® formulation.  Formulations 2-5 contain the same cosolvents as Zemplar®, but also contain benzyl alcohol (a preservative), N-acetyl-cysteine (an antioxidant), or sodium metabisulfite (an antioxidant):

| Ingredient | Quantity per Formulation | | | | |
|---|---|---|---|---|---|
| | Formulation 1 | Formulation 2 | Formulation 3 | Formulation 4 | Formulation 5 |
| Paricalcitol | 5 µg/mL | 5 µg/mL | 5 µg/mL | 5 µg/mL | 5 µg/mL |
| Propylene Glycol | 30% | 30% | 10% | 30% | 30% |
| Alcohol | 20% | 20% | 40% | 20% | 20% |
| Benzyl Alcohol | N/A | 9 mg/mL | 9 mg/mL | N/A | N/A |
| N-acetyl-cysteine | N/A | N/A | N/A | 2 mg/mL | N/A |
| Sodium Metabisulfite | N/A | N/A | N/A | N/A | 1 mg/mL |
| Water for Injection | Q.S. | Q.S. | Q.S. | Q.S. | Q.S. |

[JTX13 at 5; Moreton 115:13-117:1.]

43.    In addition to avoiding the patent claims, Mr. Gibson, who had *thirty years* of formulation experience [Pinal 397:13-398:7], believed that a dedicated preservative would protect Hospira's paricalcitol product from microorganisms because he "wouldn't necessarily

have believed" the self-preservative data reported in the '799 patent [Gibson 277:17-279:6].  In other words, even in 2008, and even with the '799 patent in front of him, Hospira's lead formulator did not know whether the patented formulation would be self-preserving without adding an excipient.  Notably, even though Hospira was planning at that time to sell only a single-dose vial, Hospira was concerned about antimicrobial preservation because "sometimes clinicians will take an additional dose out of the product." [Gibson 277:17-278:3.]

44.     Hospira discontinued testing of these formulations, detecting higher levels of impurities in the formulations containing antioxidants. [JTX13 at 5; Moreton 119:1-13.]

45.     Hospira next turned to Formulations 6 and 7.  These formulations contained the same ingredients as Zemplar®, but with slightly different ratios of ethanol and PG. [JTX13 at 6; Moreton 119:14-120:1.]  While Hospira deemed both formulations acceptable, it ultimately selected Formulation 7—the same 40% (v/v) ethanol, 10% (v/v) PG formulation expressly disclosed as a preferred embodiment of the '799 patent. [JTX13 at 6; Moreton 120:2-8.]

**B.     Hospira Infringes Each and Every Element of the Asserted Claims**

46.     Asserted claim 7 of the '799 patent, which has been rewritten below to incorporate the limitations of claims 1 and 6, states:

> [1]   A   sterilized,   self-preserved,   aqueous   pharmaceutical composition for parenteral administration [2] consisting essentially of a therapeutically effective amount of paricalcitol or calcitriol, [3] about 50% (v/v) of an organic solvent selected from the group consisting of ethanol in the range of about 15% to about 30% (v/v) and propylene glycol in the range of about 20% to about 35% (v/v), and [4] about 50% (v/v) water.

47.     Claims 8 and 9 additionally recite particular concentrations for paricalcitol or calcitriol. [Moreton 122:9-11.]

48.     Hospira's only noninfringement argument for any of these claims is that its proposed product falls outside the claimed ranges for ethanol and PG. [Moreton 129:18-21.]

12

### 1. "A sterilized, self-preserved, aqueous pharmaceutical composition for parenteral administration"

49. Hospira's proposed product is "sterilized" by terminal sterilization [JTX10 at 1], and is "self-preserved," containing only ethanol, PG, and water as inactive ingredients (and no dedicated preservative) [JTX14 at 6; Moreton 129:2-8].

50. Hospira's proposed product is an "aqueous pharmaceutical composition for parenteral administration," as its proposed labeling states that "[p]aricalcitol is available as a sterile, clear, colorless, aqueous solution for intravenous injection." [JTX204 at 7; Moreton 129:2-8.] Intravenous injection is a form of parenteral administration. [Moreton 89:13-16.]

### 2. "consisting essentially of a therapeutically effective amount of par[i]calcitol or calcitriol"

51. Hospira's proposed product contains only paricalcitol, ethanol, PG, and water, and thus satisfies the "consisting essentially of" requirement of the claims. [Moreton 125:4-8.]

52. Hospira's proposed labeling states that "[p]aricalcitol injection, a Vitamin D analog, is indicated for the treatment of secondary hyperparathyroidism associated with chronic kidney disease Stage 5." [JTX204 at 1.] The "Clinical Studies" section of Hospira's proposed labeling states that patients treated with paricalcitol achieve a 30% reduction in parathyroid hormone within six weeks, demonstrating clinical efficacy. [JTX204 at 10.]

### 3. "about 50% (v/v) of an organic solvent selected from the group consisting of ethanol in the range of about 15% to about 30% (v/v) and PG in the range of about 20% to about 35% (v/v)"

53. Hospira's proposed product contains 40% (v/v) ethanol and 10% (v/v) PG. [JTX204 at 7; Moreton 130:3-8.] Because both ethanol and PG are organic solvents, Hospira's product contains "about 50% (v/v) of an organic solvent." [Moreton 130:9-14.]

54. Hospira's proposed product also meets both the ethanol and PG limitations of claim 7. [Moreton 131:6-13.]

13

55.     The Court construed the terms "about 15% to about 30%" and "about 20% to about 35%" to have their plain and ordinary meanings, rejecting Hospira's "minor variation" argument in the process.  [D.I. 168 at 1-2.]  Under the relevant case law, the broadening term "about" extends the claimed range to cover concentrations of ethanol and PG that may fall outside the strict numerical range, but that the patent explains serve the same purpose.  *See Cohesive Techs.*, 543 F.3d at 1368 ("In other words, we must look to the purpose that the 'about 30 μm' limitation serves, to determine how much smaller than 30 μm the average particle diameter can be and still serve that purpose.").

56.     It is undisputed that ethanol and PG confer the self-preserving properties of the claimed formulations.  [JTX14 at 6; PTX391 at 13; *see also* JTX2, col. 4, ll. 25-28.]  It is undisputed that the formulations in Figures 4-6 yield comparable preservative effectiveness.  [Moreton 112:14-113:20.]  The '799 patent expressly discloses Hospira's proposed 40% (v/v) ethanol, 10% (v/v) PG formulation as a preferred embodiment (Figure 6), and even cites to that embodiment to conclude that "the ratio of ethanol and PG *is not critical* to the self-preserving properties" of the claimed cosolvent formulations.  [JTX2, col. 6, ll. 65-67.]

57.     Consistent with this evidence of its infringement, Hospira told the FDA that its proposed product is the same, or substantially the same, as Zemplar®.  For example, Hospira told the FDA that the ratio of ethanol and PG in its proposed formulation was only a "***slight modification***[]" from Zemplar®, and that this minor variation did not impact solubility.  [JTX13 at 5; Moreton 137:5-15; Pinal 466:16-467:14.]  Similarly, minutes from a meeting between Hospira and a potential customer state that "Hospira has replicated the Zemplar formulation other than ***slight changes*** in the concentration of propylene glycol and alcohol."  [PTX252 at 4; Moreton 136:7-24.]

58.     Hospira also represented to the FDA that its proposed product "*[c]ontains the same active and inactive ingredients in the same concentration*" as Zemplar®.  [PTX73; Moreton 137:16-138:15.]  Specifically, Hospira requested a waiver of certain study requirements, telling the FDA that "[t]he bioequivalence of Hospira Paricalcitol Injection and Zemplar® is self-evident."  [PTX73; Moreton 137:16-138:1.]  While bioequivalence may not be enough, on its own, to establish infringement, Hospira went *much further* by asserting that bioequivalence to Zemplar® was "self-evident."  This is only true if Hospira's product "[c]ontains the same active and inactive ingredients in the same concentration as a drug product that is the subject of an approved full new drug application . . . ."  [PTX73 (quoting 21 C.F.R. § 320.22(b)(1)); Moreton 138:5-15; Pinal 464:8-10, 464:17-466:15.]  Thus, Hospira did not just tell the FDA that it had a similar formulation to Zemplar®; it told the FDA they are "the same."

59.     Hospira also established a broad release specification of ±4% for the content of ethanol and PG in its proposed product, meaning that Hospira can release into the marketplace a product that contains as little as 36% (v/v) ethanol and as much as 14% (v/v) PG.  [JTX10 at 19; Moreton 132:4-12.]  Hospira's broad release specification is consistent with the language in the '799 patent that the ratio of ethanol and PG "is not critical."  [Moreton 133:2-6.]

60.     While Dr. Pinal contended at trial that Hospira's proposed product is "significantly different" than Zemplar®, Hospira told its customers that its proposed product is "***not that different***" than Zemplar®—which Hospira admits is covered by the asserted claims. [UF ¶ 52; Pinal 410:1-3.]  Specifically, in internal meetings discussing its potential customer DaVita, Hospira explained that "[f]uture working meetings will have to focus on demonstrating to DaVita that [Hospira's] formulation is not that different [from AbbVie's Zemplar®]."  [PTX45 at 1; Moreton 135:17-136:6; Pinal 468:25-469:16.]

15

61.     Hospira's proposed product therefore meets the "ethanol in the range of about 15% to about 30% (v/v)" and "propylene glycol in the range of about 20% to about 35% (v/v)" limitations of the asserted claims.

### 4.     "about 50% (v/v) water"

62.     Hospira's proposed product contains about 50% (v/v) water, and therefore satisfies this claim term.  [Moreton 129:14-17; JTX204 at 7.]

### 5.     Claims 8 and 9

63.     Hospira's proposed labeling states that "[p]aricalcitol injection is available as a multi-dose vial in the following presentations:  2 [μg] per mL (1 mL vial), 5 [μg] per mL (1 mL vial), and 5 [μg] per mL (2 mL vial)."  [JTX204 at 1, 2.]

64.     All three presentations of Hospira's proposed product meet the additional claim limitation of claim 8, which requires a paricalcitol concentration of "between about 2 μg/ml and about 10 μg/ml."  [Moreton 140:10-25.]  Hospira's 5 μg/ml presentations meet the additional claim limitation of claim 9, which requires a paricalcitol concentration of "about 5 μg/ml."  [*Id.*]

### C.     Hospira's Renewed Claim Construction and Prosecution Disclaimer Arguments Conflict with the Evidence of Record

65.     Against the substantial evidence of infringement, Hospira reiterates its arguments from the *Markman* hearing.  Hospira argues that the "plain and ordinary meaning" of "about" should be limited to minor variations, relying on the discrepancies between the targeted and observed percentages in Table 1.  [Pinal 343:20-344:9.]  As explained by Hospira's expert, Dr. Pinal, Table 1 shows that "about" covers only formulations that a person of skill in the art would recognize were intended to be within the strict numerical limits in the claims, but that, for whatever reason, ended up outside those limits.  [Pinal 344:24-346:16.]

66.     But this position was already rejected by the Court, which expressly found that "[t]he specification fails to link the minor numerical variations displayed in Table 1 . . . to the term 'about' in Claim 1." [D.I. 168 at 2 n.1.]  Moreover, Hospira's construction would render claims 12 and 14 of the '799 patent meaningless, as "[t]hose claims recite exact percentages of ethanol, [PG], and water within claimed pharmaceutical formulations but do not employ the qualifying word 'about.'" [Id.]  If "about" is limited to these minor errors, "then Claims 12 and 14 would cover effectively nothing." [Id.]

67.     As discussed in FOF 53-61 above, the '799 patent makes clear that "about" covers the disclosed embodiments, including the 40% (v/v) ethanol, 10% (v/v) PG formulation, because, in describing those embodiments, "the written description explicitly provides that 'the ratio of ethanol and [propylene glycol] is not critical to the self-preserving properties of [the] cosolvent formulation.'" [Id.]

68.     Through its expert, Dr. Pinal, Hospira also repeated its failed claim construction argument that AbbVie disclaimed the 40% (v/v) ethanol, 10% (v/v) PG embodiment described in Figure 6 (Hospira's formulation) during prosecution of the '799 patent by not citing it in a single sentence discussing synergy.  [Pinal 449:25-450:3.]  But Dr. Pinal admitted that he was not qualified to "articulate the bases for disclaimers" and does not "have a hard grasp on the legal principles." [Pinal 454:22-455:15.]  In contrast, Dr. Moreton explained the requisite legal standard (that a clear disclaimer is required) and explained that there was no evidence in the prosecution history that would change the plain and ordinary meaning of "about."[2]  [Moreton 139:7-140:1.]

---

[2] Dr. Moreton is an unquestioned expert in pharmaceutical formulation, with 35 years of industry experience.  He has authored numerous monographs in the Handbook of Pharmaceutical

69.     Claim 1 as originally filed was directed to a pharmaceutical composition comprising "an organic solvent selected from the group consisting of low molecular weight alcohols and glycol derivatives." [JTX5 at 17.] In "Amendment A," claim 1 was amended to recite a pharmaceutical composition consisting essentially of "about 50% (v/v) organic solvent" and "about 50% (v/v) water." [JTX5 at 241-42.]

70.     "Amendment B" further amended claim 1 to clarify that the "about 50% (v/v) organic solvent" was "selected from a group consisting of low molecular weight alcohols in the range of about 15% to about 30% (v/v) and glycol derivatives in the range of about 20% to about 35% (v/v)." [JTX5 at 307.] The inventors identified original claims 7, 8, and 9 as providing written-description support for this amendment, as these original claims contained the same claim language that was inserted into claim 1. [JTX5 at 17, 308.]

71.     In both Amendments A and B, the patent applicants explained that the claimed inventions provided unexpected synergy in killing microorganisms. In Amendment A, the applicants cited the "specification, page 5, line 35 through page 6, line 12; Example 3; Tables; and the Figures" as evidencing these unexpected results. [JTX5 at 244.] In Amendment B, the applicants cited "page 6, lines 7-12" of the specification, and also drew the examiner's attention to "Figures 1 through 5." [JTX5 at 310.]

72.     Hospira's argument, based on the failure to identify Figure 6 in this single sentence in Amendment B, is not reconcilable with the law of prosecution disclaimer, which requires "a clear and unambiguous disavowal of claim scope." *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003); *Omega Eng'g*, 334 F.3d at 1325; *Invitrogen*,

---

Excipients, held leadership positions in the Excipient Committees at USP, and has formulated numerous parenteral products. [JTX302; Moreton 87:20-93:18.]

327 F.3d at 1369.  It is counterintuitive to infer that the applicants intended to disavow claim

scope when discussing synergy (which is not a claim limitation, but rather an unexpected result),

when a separate section of Amendment B, entitled "Remarks," provides independent support for

the claim amendment.  [JTX5 at 308-11; *see* COL 81-85.]

73.     Notably, the claim amendment was ***not*** needed to overcome any prior art at issue.

[Moreton 139:11-140:1.]  Indeed, Dr. Pinal admitted that the claims that existed prior to

Amendment B requiring "about 50% (v/v) organic solvent" and "about 50% (v/v) water",

already avoided the prior art asserted by the patent examiner (including the "Whittle" reference

describing a 90 % (v/v) PG, 10% (v/v) ethanol formulation) as well as the other prior art of

record.  Further, Dr. Pinal agreed that the later amendment "wasn't made to get around

something that was in similar proportions to Hospira's proposed products."  [Pinal 458:6-460:4.]

## IV.     CONCLUSIONS OF LAW REGARDING INFRINGEMENT

74.     An infringement analysis entails two steps:  (1) determining the meaning and

scope of the asserted patent claims, a question of law; and (2) comparing the properly construed

claims to the accused product or process, a question of fact.  *Markman v. Westview Instruments,*

*Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

75.     The words of a claim are generally given their ordinary and customary meaning to

a person of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d

1303, 1312-13 (Fed. Cir. 2005) (en banc); *see also Finjan, Inc. v. Secure Computing Corp.*,

626 F.3d 1197, 1207 (Fed. Cir. 2010) (holding that the district court did not err in instructing the

jury to give the claim term its ordinary meaning without additional guidance).

76.     To prove infringement, the patentee must show by a preponderance of the

evidence that an accused product embodies all limitations of the claim.  *Baxter Healthcare Corp.*

*v. Spectramed, Inc.*, 49 F.3d 1575, 1582-83 (Fed. Cir. 1995).

77.     Submission of a paper NDA seeking approval to engage in the commercial manufacture, use, or sale of a drug claimed in a patent is an act of infringement under the Hatch-Waxman Act.  35 U.S.C. § 271(e)(2)(A); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) ("[W]hat is achieved by § 271(e)(2) [is] the creation of a highly artificial act of infringement that consists of submitting an ANDA or a paper NDA containing [a paragraph IV] certification that is in error as to whether commercial manufacture, use, or sale of the new drug (none of which, of course, has actually occurred) violates the relevant patent.").

78.     Following the *Markman* hearing in this case, the Court construed the terms "about 15% to about 30%" and "about 20% to about 35%" to have their plain and ordinary meanings. [D.I. 168 at 1-2.]  The Court rejected Hospira's "stealth attempt to narrow the construction of 'about' to mean 'inevitable measuring errors,' 'minor deviations,' and 'minimal mathematical variance' that purportedly result from making the claimed cosolvent systems."  [*Id.* at 1 n.1.]

79.     The plain and ordinary meaning of "about" must be interpreted in the context of the technology at issue.  *Cohesive Techs.*, 543 F.3d at 1368 (citing *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995)).  "In determining how far beyond the claimed range the term 'about' extends the claim, '[courts] must focus . . . on the **criticality** of the [numerical limitation] to the invention.'"  *Id.* (second alteration in original) (quoting *Ortho-McNeil*, 476 F.3d at 1327).  Thus, the broadening term "about" extends the claimed ranges to cover concentrations that serve the same purpose as concentrations that would otherwise fall strictly within the numerical range.  *See id.* ("In other words, we must look to the purpose that the 'about 30 μm' limitation serves, to determine how much smaller than 30 μm the average particle diameter can be and still serve that purpose."); *see also Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1355-56 (Fed. Cir. 2007)

(relying on a patent figure showing effective concentrations outside the recited range to determine how far "about" extends the claim).

80.     Importantly, the '799 patent emphasizes that "the ratio of ethanol and PG is ***not critical*** to the self-preserving properties" of the claimed cosolvent formulations, meaning that the ethanol and PG concentration ranges should be extended to cover other ethanol and PG concentrations that provide the same self-preserving properties.  [FOF 53-56.]  The '799 patent also expressly sets forth Hospira's proposed formulation as a preferred embodiment (Figure 6), and even cites to that embodiment to support the concept that the ratio of ethanol and PG is not critical.  [FOF 36.]  Under well-established principles of claim construction, this embodiment meets the ethanol and PG claim terms because (1) those terms are extended by "about," and (2) the '799 patent teaches that the concentrations of ethanol and PG in that embodiment serve the same purpose as concentrations within the strict numerical range.

81.     For prosecution disclaimer to attach, an alleged disavowing statement must be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.  *Omega Eng'g*, 334 F.3d at 1325-26 (citing *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294-95 (Fed. Cir. 2000)).  "[T]he court will not use [an ambiguous disclaimer] to limit a claim term's ordinary meaning." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).

82.     "[C]onstruing a claim to exclude a preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Invitrogen*, 327 F.3d at 1369 (citation omitted).

83.     The lack of citation to Figure 6 in a discussion of unexpected results should not be interpreted as a disclaimer of claim scope, because synergy is not a requirement of the claims.  In

21

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, the district court concluded that certain formulations were disavowed because the file history stated that they did not control pain relief "with an approximately four-fold dosage range."  438 F.3d 1123, 1136 (Fed. Cir. 2006) (citation omitted).  The Federal Circuit reversed, stating that "[w]hile it is true that Purdue relied on its 'discovery' of the four-fold dosage range to distinguish its claimed oxycodone formulations from other prior art [compounds]," "the claims contain no limitations relating to the effectiveness of dosages in controlling pain in patients, and it is the claims ultimately that define the invention." *Id.*

84.     Disclaimer based on a single statement must be clear and unambiguous.  In *Creative Integrated Systems, Inc. v. Nintendo of America, Inc.*, the Federal Circuit held that the district court erred by disavowing an embodiment based on a single sentence in the file history that explained features of the amended claims.  526 F. App'x 927, 934 (Fed. Cir. 2013).  The court held that "[w]hile a court may rely on a single statement as evidence of disavowal, that statement must nevertheless be clear and unambiguous."  *Id.* (citation omitted).

85.     Hospira's effort to exclude the 40% (v/v) ethanol, 10% (v/v) PG embodiment based on the lack of citation to Figure 6 in a discussion of synergy shows neither reasonable clarity and deliberateness, nor unmistakable and unambiguous evidence of disclaimer.  [FOF 68-73.]  The citation was not intended as a comment on the scope of the claims, which do not require synergy, but was instead provided to explain the unexpected results.[3]  [FOF 70-72.]

---

[3] While the applicant initially references Figures 1-5, the elaborating discussion focuses exclusively on Figures 1-4.  [JTX5 at 310-11; Pinal 461:6-462:2.]  This makes sense, because only these figures provide an express comparison between the individual components (Figures 1 and 2), the predicted additive result (Figure 3), and the actual results obtained (Figure 4).  It would have been inappropriate to discuss Figures 5 and 6, because the '799 patent does not

Thus, the lack of citation should not displace the "heavy presumption that claim terms carry their full ordinary and customary meaning." *Omega*, 334 F.3d at 1323 (internal quotation marks omitted). This is particularly true given that excluding a preferred embodiment "is rarely, if ever, correct." *Invitrogen*, 327 F.3d at 1369.

86.     When construed in the proper "technologic and stylistic context," Hospira's proposed product meets each and every claim limitation of claims 7-9 of the '799 patent. *See Pall*, 66 F.3d at 1217; *Cohesive Techs.*, 543 F.3d at 1368.

87.     Thus, AbbVie has shown, by a preponderance of the evidence, that (1) Hospira infringed claims 7-9 of the '799 patent by submitting paper NDA No. 201-657 prior to the expiration of the '799 patent; and (2) Hospira will literally infringe the asserted claims if it makes, uses, sells, offers to sell, or imports into the United States its proposed product prior to the expiration of the '799 patent.

## V.     FINDINGS OF FACT RELATED TO NONOBVIOUSNESS

88.     It is undisputed that the inventions of claims 7-9 of the '799 patent are novel. [Moreton 141:3-11; Pinal 396:22-397:6.]

89.     Hospira contends that claims 7-9 would have been obvious in view of two combinations of prior art identified for the first time two days before trial: (1) the '925 patent in light of the Calcijex® label and in view of the level of skill in the art as found in Sweetana and Nema; and (2) the '957 patent in light of the '925 patent prosecution history or Malluche.

### A.     Hospira's Eleventh-Hour Defense

90.     It took Hospira more than four years to advance any obviousness argument at all, and more than five years to articulate the theories put forward at trial.  [FOF 91-93.]

_____

include a similar analysis of the individual components for these formulations.  [Moreton 114:6-9.]

91.     Hospira began studying the '799 patent in early 2008.  [Giles 294:6-21.]  After a year of study, and after considering the '925 patent and certain prior art, Hospira's IP Director, David Giles, concluded that Hospira had "*no credible invalidity attack*."  [PTX224; PTX201; Giles 300:23-301:3, 301:18-304:21; Pinal 399:12-400:10.]

92.     Although Hospira retained outside counsel in 2008, it did not include an invalidity position in its Paragraph IV notice letter, dated June 7, 2011.  [PTX182; Giles 296:7-297:14.] Nor did it include an invalidity counterclaim in its Answer, dated September 7, 2011.  [D.I. 7.]

93.     It was not until May 2012 that Hospira alleged that the '799 patent was invalid under 35 U.S.C. § 103.  [D.I. 21.]  Two days before trial, Hospira came up with new obviousness allegations, asserting two combinations of references not previously asserted.

**B.      Hospira's First Obviousness Combination—the '925 Patent in View of the Calcijex® Label and the Level of Skill in the Art—Lacks Merit**

94.     The '925 patent discloses the use of Vitamin D compounds for treating hyperparathyroidism.  [JTX34, col. 1, l. 47 to col. 2, l. 62, claim 1.]

95.     The '925 patent, however, does not disclose a pharmaceutical composition containing water, ethanol, and PG, let alone at the claimed ranges.  [Moreton 147:1-8.]  Indeed, the '925 patent does not disclose any formulations whatsoever, much less a self-preserving formulation, as required by the claims.  [Moreton 147:9-18.]

96.     Besides the boilerplate statement that "[t]he compounds are advantageously administered by injection, or by intravenous infusion of suitable sterile solutions, or in the form of oral doses via the alimentary canal, or topically in the form of ointments, lotions, or in suitable transdermal patches," the '925 patent contains *no* guidance on the types of parenteral formulations that may be administered, and provides *no* examples of formulations made with the disclosed compounds.  [JTX34, col. 8, ll. 23-27; Moreton 146:12-25; Pinal 430:6-431:5.]

97.     The Calcijex® label teaches solubilizing Vitamin D with a surfactant (Polysorbate 20), not a cosolvent system as required by the claims.  [JTX254; Moreton 99:22-24; Pinal 404:22-405:2.]  As such, it teaches *away* from (not towards) the invention.  The Calcijex® formulation does not include ethanol and PG, let alone at the claimed ranges.  [JTX254 at 1; *see* Moreton 151:5-7.]

98.     The Calcijex® formulation includes, among other things, an antioxidant, buffering agents, and a chelating agent, all of which are criticized by the '799 patent and excluded from the scope of the claims.  [JTX254 at 1; Moreton 151:20-23; Pinal 407:5-24.]

99.     Sweetana teaches that solubilizing Vitamin D compounds such as paricalcitol and calcitriol was both difficult and unpredictable.  The authors state that most parenterally acceptable cosolvents influence solubility in "an unpredictable manner," and conclude that "[s]olubilization of poorly water soluble or water insoluble drugs for use in intravenously administered dosage forms is a very formidable task for the parenteral formulation scientist." [JTX32 at 3, 13; Moreton 151:24-152:21, 154:4-24; Pinal 411:25-413:23, 415:23-416:7.] Solving a "formidable task" is unlikely to be obvious, especially in an unpredictable field.

100.    Nema teaches that the surfactant Tween 80 was used in more parenteral products than either ethanol or PG (let alone a combination of the two), and both Sweetana and Nema expressly identify Calcijex® as containing a surfactant, not a cosolvent.  [JTX31 at 5; JTX32 at 8; Moreton 261:6-262:25; Pinal 406:18-25.]  While Sweetana and Nema identify certain commercial formulations or concentrates in the prior art *for other active ingredients* containing both ethanol and PG, none were for Vitamin D analogs.  Moreover, all of the multi-use products

contained additional excipients discouraged by the '799 patent and excluded by the claims, thus teaching away from the claimed invention.[4]  [Moreton 158:4-163:10.]

101.    While Hospira argues that it would have been obvious to replace the surfactant used in Calcijex® with the claimed cosolvents, a skilled formulator would have focused on surfactants because it was preferable to use solubilization methods that had been used successfully for similar compounds.  [Pinal 411:17-20.]  This approach is confirmed not only by the commercial formulations for Calcijex®, Hectorol®, and Oxarol®, but also through the work of Hospira's expert, Dr. Pinal, who did not use cosolvents, but instead used a surfactant to solubilize calcitriol for an injectable product while working at Hoffman La Roche in the 1990s.[5]  [PTX752; PTX755; Moreton 155:6-156:8; Pinal 408:3-24, 410:4-12, 411:11-16.]  Indeed, Zemplar® is the only commercial Vitamin D product of record that does not contain a surfactant.  This is a testament to the unconventional approach taken by the inventors.

### C.    Hospira's Second Obviousness Combination—the '957 Patent in View of the '925 Patent Prosecution History or Malluche—Lacks Merit

102.    The '957 patent is directed to compositions of certain Vitamin D compounds.  [DTX355, col. 2, ll. 24-29.]

---

[4] Hospira misconstrues a statement from Nema indicating that ethanol and PG were used, alone or in combination with other solvents, in more than 50% of parenteral cosolvent systems.  Of the more than 700 injectable products reviewed in the Nema article, less than 4% contained each excipient, and far fewer contained both.  [*See* Moreton 260:16-261:5; JTX32 at 7.]

[5] Dr. Edward Pec, an inventor of the '799 patent, testified that cosolvency was a "technique that was defined out of the pharmaceutical textbook."  [Pec Dep. Tr. 87:2-5.]  However, there is no testimony or evidence establishing that cosolvency was an approach used for commercial Vitamin D formulations, or that Vitamin D analogs would be stable in a cosolvent aqueous pharmaceutical composition without the use of antioxidants and/or buffers.  In addition, while Dr. Pec was aware of the cosolvency technique, he testified that the pharmaceutical textbook made "no mention" of the antimicrobial nature of ethanol or PG, and he was not aware that either solvent was known to have an antimicrobial effect in pharmaceutical formulations.  [Pec. Dep. Tr. 47:19-21, 47:23-48:11.]

103.    Read as a whole, the '957 patent is directed to formulations for oral use. [Moreton 145:12-15.] All of the formulation examples described in the '957 patent are directed to oral capsules and tablets, not parenteral formulations as required by the '799 patent claims. [Moreton 145:16-146:4; Pinal 432:6-14.]

104.    While the '957 patent discusses injectable products in passing, it does *not* describe a three-part mixture of water, ethanol, and PG, let alone at the claimed concentrations. [DTX355, col. 2, ll. 24-29; Moreton 143:10-13.] As Dr. Moreton explained, if "sterile pyrogen-free water, sterile peroxide-free ethyl oleate, dehydrated alcohol, propylene glycol or a dehydrated alcohol/propylene glycol mixture" included combinations thereof, it would not have been necessary to list ethanol and PG both individually and as a dehydrated ethanol/PG mixture. [Moreton 144:7-20.] In other words, if one says you can use:  A, B, C, D, E, or a mixture of B and E, that simply does not disclose or suggest mixtures of any of A through E; indeed, it suggests just the opposite.  [Moreton 144:21-25.] While Hospira argues that the '957 patent would have nevertheless been understood to teach a ternary mixture because Vitamin D compounds are not soluble in water, that is a red herring because, as Dr. Pinal acknowledged, other excipients such as surfactants could be added to the water to solubilize the drug, just as had conventionally been done with Calcijex®.  [Pinal 433:7-22.]  In short, Hospira's counterintuitive interpretation of this reference illustrates how the lens of hindsight can distort an otherwise unambiguous disclosure.

105.    Notably, the '957 patent expressly teaches that Vitamin D formulations should include an antioxidant, which is discouraged by the '799 patent and excluded by the claims of the '799 patent.  [DTX355, col. 2, ll. 43-48; Moreton 145:4-7.]  The '957 patent also does not teach or suggest "self-preserving" compositions.  [Moreton 146:5-8.]

27

106.    The '925 file history (JTX287) and Malluche (DTX346) both disclose formulations intended for use in animals, not people.[6]  In particular, the '925 file history includes results from a *rat* study involving the intraperitoneal administration of a paricalcitol solution containing 95% (v/v) PG and 5% (v/v) ethanol.  [JTX287 at 105-113; Moreton 147:22-148:7.]  Likewise, Malluche described a *dog* study involving the subcutaneous administration of calcitriol in a 1:1 solution of ethanol:PG.  [DTX346 at 755; Moreton 149:1-17.]

107.    It is undisputed that there are fundamentally different considerations for administering drugs to animals and humans, because animal studies typically use much higher concentrations of drug and generally disregard discomfort.  [Moreton 150:1-14; Pinal 431:23-432:5.]  These formulations would not have suggested anything to the person of ordinary skill looking to design a formulation for human use.  [Moreton 148:19-22, 150:11-14; Pinal 432:1-5.]

108.    In any case, and more fundamentally, neither the '925 file history nor Malluche describe or suggest a ternary mixture of ethanol, PG, and water, let alone at the ranges recited in the asserted claims.  [Moreton 148:15-18, 149:22-25.]

### D.    Fundamental Deficiencies in Hospira's Obviousness Theories

109.    None of the references asserted by Hospira teach or suggest a pharmaceutical composition containing paricalcitol or calcitriol, water, ethanol, and PG, let alone at the claimed concentrations.  [FOF 95, 97, 104, 108; Moreton 169:17-170:6.]

110.    None of the references asserted by Hospira teach or suggest that the claimed compositions of ethanol and PG would be self-preserving.  [Moreton 106:19-107:14.]

---

[6] While Hospira asserted Malluche as one of its primary references at trial, that reference appeared only once—in a string cite of seven references—in Hospira's 85-page pretrial findings of fact and conclusions of law.  This illustrates Hospira's difficulty in formulating any obviousness argument at all.

111.    While Hospira nevertheless contends that the claimed compositions would have been understood as "self-preserving" in view of an excerpt in the Takruri reference stating that ethanol and PG had preservative properties, Takruri (which was not limited to parenteral formulations) does not teach or suggest that the claimed concentrations of ethanol and PG would be understood as *self-preserving*.  [JTX35 at 15; Moreton 106:19-107:14.]

112.    This is clearly established by the commercial, prior art "multi-use" formulations containing both ethanol and PG.  Unlike single-use formulations, "multi-use" parenteral formulations must pass the USP test before they can be approved for sale by the FDA.  [Moreton 105:13-16.]  Despite containing 10% (v/v) ethanol and 40% (v/v) PG, the multi-use formulations for Valium®, Septra®, and Nembutal® each included a dedicated preservative or other excipients known to improve preservative efficacy.[7]  [PTX237; PTX240; PTX239; Moreton 158:11-163:10.]  These formulations establish that the claimed amounts of ethanol and PG were ***not*** understood as self-preserving, because (1) a skilled formulator would not include an additional excipient unless it was necessary, and (2) the FDA dissuades use of unnecessary excipients.  [Moreton 163:6-10; Pinal 427:25-428:4.][8]

113.    Notably, even a decade after the filing date of the '799 patent, Hospira's lead formulator, Michael Gibson, was *still* unsure that the claimed formulations would be self-

[7] Nembutal® uses pH adjusting agents to adjust the pH of the formulation to a level that is known to have a limiting effect on the growth of microorganisms.  [PTX239; Moreton 161:22-163:1.] As stated in the prior art "pH can have a limiting effect on the survival and growth of microorganisms. . . .  Bacteria are tolerant of pH and are able to thrive in the pH range of 3.5-8.5. Yeasts and filamentous fungi prefer more acidic conditions of pH 4-6."  [JTX35 at 12; Moreton 263:23-264:12, 264:24-265:4.]

[8] While Dr. Pinal tried to explain this away by asserting that the FDA might approve additional excipients if they were intended for different purposes [Pinal 427:10-16], that does not change the fact that skilled formulators would *not* add unnecessary excipients.  Thus, the addition of preservatives to these products reflects that their sponsors (sophisticated companies such as GSK and Roche) did not believe the formulations to have been self-preserving on their own.

preserving.  [Gibson 277:24-278:20; Pinal 400:7-15, 400:24-401:6; *see also* PTX156 at 4; Beckhorn 312:6-313:22.]  This strongly undermines any purported expectation of success.

114.    Hospira's obviousness allegations also ignore that the claimed compositions must "***consist essentially of***" (not "comprise") the Vitamin D compound, water, ethanol, and PG.  It is undisputed that all of the commercial prior art formulations of record—including Calcijex®, Valium®, Septra®, Nembutal®, and Brevibloc®[9]—contained excipient types that the '799 patent expressly discourages.  [JTX254; PTX237; PTX240; PTX239; Moreton 151:20-23, 158:11-163:10; Pinal 406:18-407:24.]  Moreover, the '957 patent, one of Hospira's primary obviousness references, teaches that Vitamin D formulations should include an antioxidant, which the '799 patent expressly criticizes.  [DTX355, col. 2, ll. 43-48; Moreton 145:4-7.]  Notably, Dr. Pinal, Hospira's expert, did not say anything about "consisting essentially of" in his expert reports, and explained at his deposition that, because of the "consisting essentially of" language, Zemplar® would not have been covered by the claims if it contained any excipients other than ethanol, PG, and water.  [Pinal 423:2-425:5.]

115.    The claims as originally drafted used the transitional phrase "comprising," which would have allowed for additional excipients.  [JTX5 at 17.]  That tracks the specification, which indicates that excipient use might be permissible in certain circumstances.  [JTX2, col. 3, ll. 61-65.]  But, during prosecution, the applicants narrowed the claims by replacing "comprising" with "consisting essentially of," making it clear that the claims are drawn to the

---

[9] The Brevibloc® reference, in addition to having nothing to do with Vitamin D compounds, is not a multi-use product, and was never suggested in the art to have self-preserving properties. [Pinal 414:6-25.]  Indeed, Hospira had carefully studied the Brevibloc® reference (as well as the '925 patent, which now serves as one of its primary references) before determining that it had "no credible invalidity attack" on the '799 patent.  [PTX224; PTX201; Giles 300:23-301:3, 301:18-304:21; Pinal 399:12-400:10.]

preferred formulations, i.e., those without additional excipients such as antioxidants, surfactants,

chelating agents, and pH buffers—all of which are expressly discouraged in the '799 patent.

[JTX5 at 241-42; *see also* Pinal 424:16-425:5.]

116.    Notably, Hospira recognized this fact, observing that "[s]ince the wording of the

claim is 'consisting essentially of', inclusion of any additional ingredient takes the formulation

outside the scope of the patent."  [JTX23 at 7-8; Moreton 117:25-118:5, 118:15-20.]

**E.      The Objective Evidence Supports a Finding of Nonobviousness**

117.    AbbVie presented evidence of unexpected results, commercial success, and

copying.  Hospira's expert ignored the evidence of commercial success and copying.  [Pinal

434:14-19, 436:10-17.]  Hospira's expert attempted to rationalize the unexpected synergy with

citations to papers from journals involving food safety, not pharmaceuticals, but did not cite a

single paper consistent with his proposed alternative methodology for measuring synergy, and

failed to explain the 100,000-fold increase in mold killing discovered by the inventors.  [Pinal

439:7-440:12, 444:9-11; Moreton 164:16-23.]

**1.      The Claimed Formulations Display Unexpected Synergy in Killing
          Microorganisms**

118.    As discussed in FOF 24 and 33-34 above, the inventors discovered a "synergistic

preservative effect," in which the cosolvents produces an antimicrobial effect greater than the

sum of the effects of each agent alone.  [*See, e.g.*, JTX2, col. 1, ll. 53-57; Moreton 164:1-15.]

Nothing in the prior art would have led a skilled formulator to predict these synergistic results,

which further support the nonobviousness of the claims.  [Moreton 167:19-22.]

119.    Hospira's expert, Dr. Pinal, argues that the inventors should have compared the

20% (v/v) ethanol, 30% (v/v) PG solution with a solution containing 50% (v/v) ethanol and a

solution containing 50% (v/v) PG instead of with a 20% (v/v) ethanol solution and a 30% (v/v)

PG solution.  [Moreton 164:16-19.]  But Dr. Pinal's opinion is conclusory, as he did not identify *even a single prior art reference* that evaluated synergy using his proposed method.  [Moreton 164:20-23.]

120.    Indeed, it is undisputed that the prior art defines synergy consistent with the disclosure of the '799 patent:  when the preservative effect of two cosolvents is greater than the sum of the individual effects.  [JTX35 at 31; Moreton 163:16-164:15; Pinal 438:6-12.]  Dr. Pinal's proposed method suffers, inter alia, because there is no common reference between the concentrations of cosolvents used when tested alone and in combination.  [Moreton 164:24-165:13.][10]

121.    Dr. Pinal argues that the amount of water in the formulation could influence the preservation studies, again relying principally on articles from food science journals.  But differences in water content cannot explain the dramatic, 100,000-fold increase in mold death reported in the '799 patent.  [Moreton 167:19-22; Pinal 439:7-440:12.]

122.    Relying exclusively on a single article from a food science journal, Dr. Pinal further argues that the synergy tests are flawed because deviations from a strict linear relationship were known in the prior art.  [Pinal 391:21-392:7.]  This reference is inapposite, however, because it does not (1) involve a pharmaceutical formulation, (2) examine mold killing, or (3) examine combinations of ethanol and PG.  [DTX377; Moreton 167:9-22.]

---

[10] Dr. Pinal's proposed methodology is clearly flawed.  For example, following Dr. Pinal's proposed method, one would predict the effectiveness of a composition of 49.9% PG and 0.1% ethanol by adding the effectiveness of a solution containing 50% PG and a solution containing 50% ethanol, thus increasing the ethanol concentration 500-fold while barely changing the PG concentration.  But that does not make sense given the negligible quantity of ethanol in the formulation of interest.  In contrast, the methodology set forth in the prior art and in the '799 patent provides a common benchmark for the preserving agents in the formulations, as explained by Dr. Moreton.  [Moreton 164:20-165:13.]

123.    Dr. Pinal's criticisms of the preservation studies in the '799 patent ring hollow. He admitted that "[he] could have done [his] own experiments" to support his opinions, but chose not to do so—even though he had everything he needed to do the studies and could have done the experiments if he wanted to.  [Pinal 448:5-449:6.]  It was, after all, Hospira's burden to prove invalidity by clear and convincing evidence.  Yet, Dr. Pinal chose to do nothing to substantiate his position.

### 2.    Zemplar® Has Been Commercially Successful

124.    The commercial success of AbbVie's Zemplar® product was undisputed at trial.

125.    Since its launch in 1998 through 2013, Zemplar® has generated total net revenues in the United States of approximately $4.3 billion and has been used to treat over 400,000 patients.  [Coulombe 65:7-12.]  While Zemplar® was initially approved and marketed only as a single-dose product, since March 2011, it has been marketed as a multi-dose product. [Coulombe 66:18-22.]

126.    Since AbbVie introduced its multi-dose vials, over 90% of Zemplar® sales have come from its multi-dose product.  [Coulombe 69:24-70:3.]  These sales have totaled $350 million through 2013.  [Coulombe 71:15-18.]  AbbVie's multi-dose vials allowed it to both grow its business from a volume standpoint and preserve market share after the 2011 change in Medicare reimbursement, which discouraged wasting leftover product.  [Coulombe 67:6-24, 86:4-20; O'Brien 309:15-311:24; PTX46 at 2.]

127.    There is a clear nexus between the claimed invention and the commercial success of Zemplar®, including in particular the multi-dose form.  It is undisputed that Zemplar® embodies the claimed invention.  [UF ¶ 52; Moreton 168:2-14.]  In addition to being stable and solubilizing paricalcitol, the claimed compositions are self-preserving, which was necessary for obtaining FDA approval for the multi-use vials.  [Moreton 168:15-25.]  As Ms. Coulombe

33

explained, the availability of Zemplar® in the multi-dose vial was "critical" to commercial success because it was already self-sterilizing, avoided the need for reformulation, and reassured customers.  [Coulombe 70:22-71:14, 71:19-25, 86:15-20.]  Importantly, Dr. Pinal admitted that there was a demand for multi-use vials, and Hospira determined that it would exclusively make and sell multi-use vials because of customer demand.  [Pinal 435:3-436:9; PTX46 at 2; PTX108 at 2; O'Brien 308:18-311:24.]

128.    AbbVie's marketing materials emphasize these advantages:  "The Zemplar 10 [μg] Total (5[μg]/mL) multi-dose vial can be used multiple times and does not require refrigeration . . . .  The Zemplar 10-[μg] multi-dose vial is the same formulation as the 10-[μg] single-use vial but allows for more efficient use of the product to help minimize waste."[11] [PTX468 at 1; Coulombe 67:25-70:21.]

129.    Thus, the evidence shows that there is a significant demand for the patented self-preserving formulation and that it has been a commercial success.  Nor is there any question that there is a nexus between the demand for, and success of, the products embodying the '799 patent, for it is the self-preserving properties that *allow* the products to be safely used in a multi-dose fashion, without needing to add additional undesirable excipients.  This supports the validity of the claims, and has been ignored by Hospira and its expert.[12]

---

[11]  This is not a case where commercial success can be discounted because of the presence of a "blocking" patent on the active ingredient, because, as Hospira has pointed out, the claims also cover calcitriol.  [UF ¶ 48.]  Calcijex®, which contains calcitriol as its active ingredient, has been off patent since 2002, yet no one developed the claimed formulation.  [Moreton 121:3-12.]

[12]  The claimed self-preserving properties also have a clear benefit for single-use vials as well. [PTX156 at 4; Beckhorn 312:6-313:22 (indicating that Hospira knew "that customers may withdraw twice from the same vial").]  Indeed, Hospira still wanted to examine the antimicrobial effectiveness of its formulation, even though it initially intended to sell only a single-use vial. [PTX156 at 4.]

### 3.   Hospira Copied a Preferred Embodiment from the '799 Patent

130.    As discussed in FOF 40 above, Hospira knew about the '799 patent since it began

working on its generic paricalcitol product.

131.    Hospira initially sought to design around the asserted claims by adding additional

excipients to its proposed formulations, but found that this resulted in higher levels of

undesirable impurities.  [JTX13 at 5; JTX23 at 7; Moreton 119:1-13.]  Hospira then resorted to

copying a preferred embodiment directly from the '799 patent.  [JTX13 at 6; Moreton 120:2-8.]

## VI.   CONCLUSIONS OF LAW REGARDING NONOBVIOUSNESS

132.    An issued patent is presumed valid.  35 U.S.C. § 282; *see also Fromson v.*

*Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 n.1 (Fed. Cir. 1985) ("Patents are born valid and

remain so until proven otherwise.").  A party challenging the validity of a patent claim has the

burden of overcoming the presumption of validity by "clear and convincing evidence," and that

burden never changes.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011); *Eli Lilly*

*& Co. v. Teva Pharm. USA, Inc.*, 619 F.3d 1329, 1336 (Fed. Cir. 2010).

### A.   Hospira's Flawed Obviousness Combinations

133.    Using hindsight as a guide, Hospira inappropriately focuses on portions of

references while failing to consider the prior art as a whole, including art that taught away from

the claimed formulations.  "It is impermissible within the framework of section 103 to pick and

choose from any one reference only so much of it as will support a given position, to the

exclusion of other parts necessary to the full appreciation of what such reference fairly suggests

to one of ordinary skill in the art."  *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965).

134.    Here, Hospira relies on a series of Vitamin D references, but ignores that ***none of***

***them*** disclose a formulation containing ethanol, PG, and water, let alone at the claimed

combinations.  [FOF 109.]  Hospira relies on the '957 patent, but ignores that its focus is on oral

formulations, and its teaching is that Vitamin D formulations need antioxidants.  [FOF 103, 105.]

Likewise, Hospira relies on the Calcijex® label, but ignores that it uses a surfactant, rather than a

cosolvent, and that the formulation includes numerous other excipients discouraged by the '799

patent.  [FOF 97-98.]  Hospira contends that ethanol and PG at the claimed concentrations were

known to be self-preserving, but ignores that *all* of the commercial multi-use formulations

contained additional excipients that would improve preservation.  [FOF 112.]  A prior art

reference that teaches away "alone can defeat [an] obviousness claim."  *Winner Int'l Royalty*

*Corp. v. Wang*, 202 F.3d 1340, 1349-50 (Fed. Cir. 2000).

135.    Likewise, Hospira has failed to establish that the formulation of the '799 patent

was "obvious to try," because for that to have been the case, there would have had to be, inter

alia, "a finite number of identified, predictable solutions."  *KSR Int'l Co. v. Teleflex Inc.*, 550

U.S. 398, 421 (2007).  Here, the prior art establishes the very opposite:  that solubilization of a

poorly water-soluble drug such as paricalcitol was both "unpredictable" and a "very formidable

task" for the formulation scientist.  [FOF 99.]

136.    "[P]roceeding contrary to the scientific knowledge is 'strong evidence of

nonobviousness.'"  *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1364 (Fed. Cir. 2012); *see*

*also Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000).  Hospira contends that it

would have been obvious to switch from a surfactant to the claimed cosolvent system, but

multiple prior art references, including the Calcijex® label, Sweetana, and Nema, all teach that

the only commercially-available Vitamin D compound was solubilized with a surfactant.

[FOF 97, 100.]  Moreover, all of the other contemporaneously developed Vitamin D

formulations used a surfactant to solubilize the Vitamin D compounds, as did Dr. Pinal in his

1996 formulation work with calcitriol.  [FOF 101.]  Notably, Dr. Pinal only investigated the use

36

of surfactants, and there is no evidence that he even considered using a cosolvent.  [*Id.*]  While

Dr. Pinal now claims that using cosolvents would have been obvious (even preferred) back in

1998, his own contemporaneous work, long before he was retained by Hospira, showed that he

followed the conventional wisdom and used surfactants.

137.    Even where the technique used in the claimed invention is known in the art, but

the experimental process and its results are complex or unpredictable, there is no reasonable

expectation of success.  *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1088 (Fed. Cir. 2008).

Here, the art teaches that most parenterally acceptable cosolvents influence solubility in "an

unpredictable manner," and that "[s]olubilization of poorly water soluble or water insoluble

drugs for use in intravenously administered dosage forms is a very formidable task for the

parenteral formulation scientist."  [FOF 99.]  Moreover, Hospira failed to establish that a person

of ordinary skill would have reasonably expected that the claimed cosolvent system would be

self-preserved and suitable for intravenous administration.  [FOF 110-113.]  These failures

undermine Hospira's obviousness position.  *See Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d

1352, 1364 (Fed. Cir. 2011) (affirming summary judgment of nonobviousness because the

claimed formulation "would not be expected to perform properly to meet the specificity of a

pharmaceutical use" in view of the prior art).

138.    Hospira may seek to rely on the inventors' own path to cure these deficiencies,

but doing so would fundamentally violate the basic tenets of obviousness case law.  *See* 35

U.S.C. § 103(a) ("Patentability shall not be negatived by the manner in which the invention was

made.").  "The only inquiry is whether the teachings of the [relevant prior art] . . . would have

rendered the claimed invention obvious to one of ordinary skill in the art; this inquiry, as a matter

of law, is independent of the motivations that led the inventors to the claimed invention." *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000).

### B.   The Claimed Invention Would Not Have Been Obvious Because the Prior Art Taught Use of Excipients Precluded by the Claims

139.   The asserted claims use the transition phrase "consisting essentially of," which excludes excipients that "materially affect the basic and novel properties" of the claimed pharmaceutical compositions. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1239 (Fed. Cir. 2003) (citation omitted). Hospira must therefore prove that it would have been obvious to exclude excipients that materially affect the basic and novel properties of the claimed invention. *See Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1574 (Fed. Cir. 1984) ("The claimed invention differs from [the prior art] because [the prior art] requires nitric acid as an essential ingredient. The [patent] claims exclude the presence of nitric acid because the essence of the claimed composition is the elimination of nitric acid and the claim phrase 'consisting essentially of' excludes ingredients that would 'materially affect the basic and novel characteristics' of the claimed composition." (citation omitted)).

140.   To determine those basic and novel properties, the court "need look no further than the patent specification." *AK Steel*, 344 F.3d at 1239-40 (holding that because the patent specification directly speaks to and answers the question whether silicon in excess of 0.5% by weight would materially alter the basic and novel properties of the invention, the claims of the patent at issue must therefore be interpreted to permit no more than 0.5% silicon by weight in the aluminum coating).

141.   Here, Hospira failed to prove that any of the excipients used in any of the prior art references (e.g., surfactants, preservatives, antioxidants, buffers, and pH adjusting agents) would not materially affect the properties of the claimed pharmaceutical compositions. To the contrary,

it is undisputed that surfactants were known to affect solubility; antioxidants were known to affect stability; and preservatives, buffers, and pH adjusting agents were known to affect preservative effectiveness.  [FOF 17, 44, 105, 112.]  Indeed, the specification of the '799 patent teaches as much, and explicitly criticizes the use of such excipients.  [FOF 27-30.]

### C.   Objective Evidence Confirms the Nonobviousness of the Claims

142.   The nonobviousness of claims 7-9 of the '799 patent is supported by evidence of unexpected results, commercial success, and copying.  Secondary evidence of nonobviousness is "often . . . the most probative and cogent evidence" available.  *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) (citations omitted); *see also Transocean*, 617 F.3d at 1305 ("Our case law is clear that [secondary evidence of nonobviousness] 'must be considered in evaluating the obviousness of a claimed invention.'") (citations omitted).

143.   It is the patent challenger's burden to establish the absence of objective evidence of nonobviousness.  *See OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 709 (Fed. Cir. 2012) ("[W]e have emphatically rejected any formal burden-shifting framework in evaluating the four *Graham* factors and the district court's failure to consider the evidence [of secondary considerations] requires reversal.").

144.   The inventions of claims 7-9 of the '799 patent demonstrate unexpected antimicrobial properties.  [FOF 24, 33-2334.]  Evidence that a combination of known components results in an effect greater than that predicted has been dispositive in holding that an invention is nonobvious.  *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1309 (Fed. Cir. 2010) ("Even if the [patent at issue] were a combination of known elements according to their established functions . . . it yields more than predictable results; thus, it is non-obvious.").

145.    The inventions of claims 7-9 of the '799 patent have also demonstrated commercial success.  [FOF 124-129128.]  When commercial success has been demonstrated and "the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention."  *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *see also Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988) ("It is sufficient to show that the commercial success was of the patented invention itself.").  The presumed nexus between the patented invention and the commercial success cannot be rebutted with mere argument; evidence must be put forth.  *Winner Int'l*, 202 F.3d at 1351-52.  Here, the evidence of record proves just the opposite.

146.    Hospira also copied the claimed invention after failing to design around the '799 patent.  [FOF 40-45, 130-131.]  "[C]opying the claimed invention, rather than one in the public domain, is indicative of unobviousness."  *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed. Cir. 1988)(citation omitted).  The evidence of copying in this case is unusually probative for a Hatch-Waxman case, because Hospira deliberately copied the patented invention after attempting, but failing, to design a non-infringing formulation.  *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 876 F. Supp. 2d 295, 419 (S.D.N.Y. 2012) ("Both Sandoz and Mylan attempted to develop alternative [noninfringing] processes . . . , but both ultimately settled on following the claimed methods."), *aff'd in relevant part*, 723 F.3d 1363 (Fed. Cir. 2013).

147.    Accordingly, for all of the reasons discussed above, Hospira has failed to prove, much less by clear and convincing evidence, that claims 7-9 of the '799 patent are invalid for obviousness under 35 U.S.C. § 103.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*

Mary B. Graham (#2256)
Derek J. Fahnestock (#4705)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
dfahnestock@mnat.com
      *Attorneys for AbbVie Inc.*

OF COUNSEL:

Michael A. Morin
David P. Frazier
Robert F. Shaffer
Krista E. Bianco
Shana K. Cyr
J. Derek McCorquindale
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001
(202) 408-4000

December 19, 2013
7866290