IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-648 (GMS) |
| | ) | (Consolidated) |
| HOSPIRA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DEFENDANT HOSPIRA, INC.'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
Monté T. Squire (No. 4764)
Rodney Square
1000 North King Street
Wilmington, DE 19801
P. O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
msharp@ycst.com

*Attorneys for Hospira, Inc.*

Dated: December 19, 2013

WILLKIE FARR & GALLAGHER LLP
Thomas J. Meloro
Michael W. Johnson
Heather M. Schneider
Sara L. Kapner
Aparnaa B. Saini
787 Seventh Avenue
New York, NY  10019-6099
(212) 728-8000

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

EXPLANATION OF CITATION FORMS........................................................................ vi

LIST OF ABBREVIATIONS............................................................................................ vi

PROPOSED FINDINGS OF FACT ...................................................................................1

I.      BACKGROUND AND SUMMARY OF FINDINGS ...........................................1

        A.      The Parties ................................................................................................1

        B.      Asserted Claims and Products at Issue .....................................................1

        C.      Development of Zemplar Injection...........................................................2

        D.      Level of Ordinary Skill in the Art............................................................3

        E.      Summary of Findings................................................................................4

II.     HOSPIRA'S NDA PRODUCT DOES NOT INFRINGE THE ASSERTED CLAIMS .....5

        A.      Under the Plain and Ordinary Meaning of "About," Hospira's Product Does Not Have the Claimed Ranges of Co-Solvents.............................................5

        B.      The Prosecution History Confirms That Hospira's Formulation Was Excluded During Prosecution ............................................................9

        C.      Plaintiffs' Additional Evidence Does Not Establish Infringement.......................10

III.    KNOWLEDGE OF A SKILLED FORMULATOR RELEVANT TO THE VALIDITY ANALYSIS...................................................................12

        A.      Background on Co-Solvents ................................................................12

        B.      Known Antimicrobial Properties of the Claimed Co-Solvents.............................15

        C.      Prior Art Co-Solvent Formulations.......................................................15

IV.     THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS OVER THE '925 PATENT IN LIGHT OF THE CALCIJEX LABEL AND THE KNOWLEDGE OF SKILLED FORMULATORS ........................................................17

V.      THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS OVER THE '957
        PATENT IN LIGHT OF THE '925 PATENT OR MALLUCHE AND THE
        KNOWLEDGE OF SKILLED FORMULATORS .........................................................19

VI.     SECONDARY CONSIDERATIONS DO NOT SUPPORT NON-OBVIOUSNESS ......22

        A.      Plaintiffs' Evidence of Unexpected Results Is Flawed and Not Commensurate in
                Scope with the Claims ...........................................................................................22

        B.      No Other Secondary Considerations Support Non-Obviousness .........................25

PROPOSED CONCLUSIONS OF LAW ......................................................................................27

I.      HOSPIRA'S NDA PRODUCT DOES NOT INFRINGE THE ASSERTED CLAIMS ...27

        A.      Plaintiffs Have Not Met Their Burden of Proving Infringement..........................27

        B.      The Prosecution History Confirms That Hospira's Formulation Was Disclosed
                But Not Claimed ...................................................................................................30

        C.      Plaintiffs' Additional Evidence Does Not Establish Infringement.......................33

II.     THE '799 PATENT IS INVALID AS OBVIOUS .............................................................33

        A.      The '799 Patent Is Prima Facie Obvious .............................................................33

        B.      Unexpected Results Do Not Support Non-Obviousness ......................................37

        C.      No Other Secondary Considerations Support Non-Obviousness .........................39

III.    CONCLUSION..................................................................................................................40

# TABLE OF AUTHORITIES

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)..................................................................................31, 32

*Abbott Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009)..................................................................................32, 33

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
    346 F.3d 1075 (Fed. Cir. 2003).......................................................................................30

*Alza Corp. v. Andrx Pharm., LLC*,
    607 F. Supp. 2d 614 (D. Del. 2009).................................................................................27

*Asyst Techs., Inc. v. Emtrak, Inc.*,
    544 F.3d 1310 (Fed. Cir. 2008).......................................................................................38

*Biogen Idec, Inc. v. GlaxoSmithKline, LLC*,
    713 F.3d 1090 (Fed. Cir. 2013).......................................................................................31

*Cephalon, Inc., v. Watson Pharm., Inc.*,
    769 F. Supp. 2d 729 (D. Del. 2011).................................................................................33

*Cohesive Techs., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008).......................................................................................29

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999).........................................................................................30

*Ex parte The NutraSweet Co.*,
    No. 91-1067, 1991 Pat. App. LEXIS 18 (B.P.A.I. 1991) .................................................37

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002), *remanded to* 344 F.3d 1359 (Fed. Cir. 2003)..................................32

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    No. 13-1034 (Fed. Cir. Dec. 11, 2013).........................................................34, 37, 39, 40

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)............................................................................................................33

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000).........................................................................................31

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012).......................................................................................34

*In re Dill*,
    604 F.2d 1356 (C.C.P.A. 1979) ......................................................................................38

*In re Grasselli,*
713 F.2d 731 (Fed. Cir. 1983)..................................................................................38

*In re Harris,*
409 F.3d 1339 (Fed. Cir. 2005)................................................................................38

*In re Peterson,*
315 F.3d 1325 (Fed. Cir. 2003)..........................................................................34, 38

*Inline Connection Corp. v. AOL Time Warner Inc.,*
Nos. 2-272, 02-477, 2007 U.S. Dist. LEXIS 6207 (D. Del. Jan. 29, 2007).......................39

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.,*
106 F.3d 1563 (Fed. Cir. 1997)..........................................................................39, 40

*Johnson & Johnston Assocs. v. R.E. Serv. Co., Inc.,*
285 F.3d 1046 (Fed. Cir. 2002)................................................................................32

*KSR Int'l Co. v. Teleflex Inc.,*
550 U.S. 398 (2007)...............................................................................................34

*Medichem, S.A. v. Rolabo, S.L.,*
437 F.3d 1157 (Fed. Cir. 2006)................................................................................35

*Merck & Co. v. Teva Pharm. USA, Inc.,*
395 F.3d 1364 (Fed. Cir. 2005)................................................................................39

*Merck & Co., Inc. v. Biocraft Labs., Inc.,*
874 F.2d 804 (Fed. Cir. 1989)............................................................................34, 35

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,*
75 F.3d 1545, 1552 (Fed. Cir. 1996)........................................................................30

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.,*
415 F.3d 1335 (Fed. Cir. 2005)................................................................................30

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.,*
719 F.3d 1346 (Fed. Cir. 2013)................................................................................37

*Ortho-McNeil Pharm., Inc, v. Caraco Pharm. Labs., Ltd.,*
476 F.3d 1321 (Fed. Cir. 2007)................................................................................28

*Pfizer v. Apotex,*
480 F.3d 1348 (Fed. Cir. 2007)......................................................................34, 35, 37

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)................................................................................27

*Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*,
    642 F. Supp. 2d 329 (D. Del. 2009)................................................................40

*Reckitt Benckiser Inc. v. Watson Labs., Inc.*,
    430 F. App'x 871 (Fed. Cir. 2011) ..........................................................32, 33

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    859 F.2d 878 (Fed. Cir. 1988)........................................................................27

*Springs Window Fashions LP v. Novo Indus., L.P.*,
    323 F.3d 989 (Fed. Cir. 2003)........................................................................31

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005)......................................................................39

*Takeda Pharm. Co. v. Teva Pharm. USA, Inc.*,
    668 F. Supp. 2d 614 (D. Del. 2009)................................................................27

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008)......................................................................30

*Wavetronix v. EIS Elec. Integrated Sys.*,
    573 F.3d 1343 (Fed. Cir. 2009)......................................................................27

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
    683 F.3d 1356 (Fed. Cir. 2012)......................................................................37

## **Statutes**

35 U.S.C. § 103................................................................................................33

## EXPLANATION OF CITATION FORMS

| DTX____ | Defendant's Trial Exhibit |
|---|---|
| JTX | Joint Trial Exhibit |
| PTX | Plaintiffs' Trial Exhibit |
| Tr. ___ | Transcript of Trial before Hon. Chief Judge Sleet, November 12 and 13, 2013 |
| Gibson II Tr. ___ | Transcript of Designated Deposition Testimony of Hospira 30(b)(6) Witness Michael Gibson, May 21, 2013 |
| Giles II Tr. ___ | Transcript of Designated Deposition Testimony of David Giles, Ph.D., May 22, 2013 |
| Li Tr. ___ | Transcript of Designated Deposition Testimony of AbbVie 30(b)(6) Witness Lukchiu Li, Ph.D., March 5, 2013 |
| Pec Tr. ___ | Transcript of Designated Deposition Testimony of Edward Anthony Pec, Ph.D., January 23, 2013 |
| Stephens Tr. ___ | Transcript of Designated Deposition Testimony of Dennis Stephens, Ph.D., February 15, 2013 |
| Stip. ¶¶ ___ | Proposed Pretrial Order, Exhibit A, Statement of Uncontested Facts |

## LIST OF ABBREVIATIONS

| '497 patent | U.S. Patent No. 5,587,497 |
|---|---|
| '799 patent | U.S. Patent No. 6,136,799 |
| '758 patent | U.S. Patent No. 6,361,758 |
| '815 patent | U.S. Patent No. 5,597,815 |
| '925 patent | U.S. Patent No. 5,246,925 |
| '957 patent | U.S. Patent No. 5,472,957 |
| AbbVie | Plaintiff AbbVie Inc. and its predecessor Abbott Laboratories Inc. |
| FDA | U.S. Food & Drug Administration |
| Hospira | Defendant Hospira, Inc. |
| NDA | New Drug Application |
| Patent Office | U.S. Patent & Trademark Office |
| WARF | Plaintiff Wisconsin Alumni Research Foundation.  The parties have filed a stipulation to remove WARF from the caption of the case.  (D.I. 189.) |

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.      BACKGROUND AND SUMMARY OF FINDINGS**

    **A.      The Parties**

    1.      Plaintiff AbbVie Inc. ("AbbVie") is a corporation organized under the laws of

Delaware with its headquarters in North Chicago, Illinois.  Plaintiff Wisconsin Alumni Research

Foundation ("WARF") is a not-for-profit Wisconsin corporation with its principal place of

business in Madison, Wisconsin.  Defendant Hospira Inc. ("Hospira") is a corporation organized

under the laws of Delaware with its principal place of business in Lake Forest, Illinois.

    2.      AbbVie was substituted for Abbott Laboratories in this action pursuant to an order

of April 10, 2013.  (D.I. 163.)  AbbVie is the owner by assignment of the '799 patent and has

standing to bring suit on the '799 patent.  (Stip. ¶ 45.)  Plaintiffs are no longer asserting the '758,

'497, and '815 patents following two stipulations of dismissal.  (D.I. 112; D.I. 183.)

    **B.      Asserted Claims and Products at Issue**

    3.      Plaintiffs are asserting literal infringement of claims 7 through 9 of the '799

patent.  (Stip. ¶ 47.)  Plaintiffs are not asserting and presented no evidence of infringement under

the doctrine of equivalents.  The asserted claims relate to formulations of the vitamin D

compounds paricalcitol or calcitriol in co-solvent systems containing certain amounts of water,

ethanol, and propylene glycol.

    4.      Claim 7 of the '799 patent depends from and incorporates the limitations of

claims 1 and 6.  Claim 7, written as an independent claim, reads as follows:

> A sterilized, self-preserved, aqueous pharmaceutical composition
> for parenteral administration consisting essentially of a
> therapeutically effective amount of [paricalcitol or calcitriol],
> about 50% (v/v) of an organic solvent selected from the group
> consisting of **ethanol** in the range of **about 15% to about 30%**
> (v/v) and **propylene glycol** in the range of **about 20% to about
> 35%** (v/v), and about 50% (v/v) water.

5.      Claim 8 specifies that the vitamin D compound is present between about 2 µg/ml and about 10 µg/ml, while claim 9 specifies that the compound is present at about 5 µg/ml.

6.      The asserted claims cover the formulation of a paricalcitol injectable product marketed by AbbVie as Zemplar® injection pursuant to NDA 20-819.  The Zemplar formulation contains 20% (v/v) ethanol, 30% (v/v) propylene glycol, and 50% (v/v) water.  (Stip. ¶ 10.)

7.      Hospira filed NDA 201-657 seeking FDA approval to market a paricalcitol injectable product prior to expiration of the '799 patent.  The formulation of Hospira's NDA product is different from Zemplar injection and the asserted claims.  Hospira's formulation contains 40% (v/v) ethanol, 10% (v/v) propylene glycol, and 50% (v/v) water.  (Stip. ¶ 17.)

8.      Hospira's development strategy was to use an alternative formulation that would not infringe the patent.  (Gibson II Tr. 64:9-17, 70:11-17, 107:23-109:9, 194:10-13; Giles II. Tr. 69:13-71:8.)  Indeed, Hospira's Notice Letter to AbbVie focused on this strong non-infringement position and reserved Hospira's rights on invalidity.  (PTX182-0005-15; Giles II Tr. 44:15-45:8, *cf.* Giles II Tr. 132:14-133:1.)

## C.      Development of Zemplar Injection

9.      Vitamin D analogs are not soluble in water and require a solubilization technique to be used in injectable pharmaceutical formulations.  (Tr. 96:3-8.)  The use of co-solvency as a solubilization technique, as well as the choice of particular co-solvents, was obtained by the inventors of the '799 patent from a standard pharmaceutical textbook.  (Pec Tr. 42:17-23, 87:2-5.)  This is not surprising, as co-solvency was one of the most common techniques to solubilize poorly water-soluble drugs like paricalcitol, and ethanol and propylene glycol were the most common co-solvents used in FDA-approved formulations.  (Tr. 362:25-363:12, 364:12-14.)

10.      According to named inventor Dr. Edward Pec, "[c]o-solvent was an approach that I found in the pharmacy textbook and it suggested common solvents to use are ethanol and

propylene glycol." (Pec Tr. 42:17-23.) He chose to use a co-solvent system, rather than using one of the solvents alone or with water, because "it was a technique that was defined out of the pharmaceutical textbook." (Pec Tr. 87:2-5.)

11.     The inventors conducted solubility studies in 1993. (Li Tr. 119:3-120:11; JTX058-0020-22.) The 20% ethanol/30% propylene glycol formulation was chosen for development by August 1994. (Stephens Tr. 138:7-142:15; JTX084-0010; Tr. 174:1-12.) The inventors tested other combinations of ethanol and propylene glycol that had higher solubility than the 20/30 formulation. (*See* JTX002-0008, Table 1; JTX144-0012; Stephens Tr. 244:22-245:22; Tr. 185:11-186:13.) However, those formulations had higher amounts of ethanol. As AbbVie explained in a European regulatory submission, a large proportion of ethanol "would have an adverse effect when given intravenously to a patient, causing irritation and pain at the injection site." (JTX144-0012; Stephens Tr. 245:23-246:14; Tr. 188:2-10.) AbbVie used the 20/30 formulation in Zemplar injection and the product was launched on April 17, 1998. The '799 patent was not filed until April 8, 1998.

### D.     Level of Ordinary Skill in the Art

12.     The person of ordinary skill in the art to whom the '799 patent is directed (a "skilled formulator") is a researcher, such as a pharmaceutical scientist, physical chemist, or medicinal chemist, involved in the research and development of pharmaceutical formulations and dosage forms, including small volume parenterals. (Tr. 324:2-15.) The person of ordinary skill in the art has (1) a Ph.D. in a field related to pharmaceutical formulation and processing (such as pharmaceutical science, pharmacy, physical chemistry, medicinal chemistry, or pharmaceutics) and at least one year of experience in pharmaceutical formulation, (2) a similar master's degree and at least two to three years of experience in pharmaceutical formulation, or (3) a similar undergraduate degree and at least five years of experience in pharmaceutical formulation. (*Id.*)

A skilled formulator would also have some knowledge of formulations utilizing vitamin D and its analogs.

13.     Although Plaintiffs' expert offered a slightly different definition of the level of skill in the art than Hospira's expert, the opinions of Hospira's expert, discussed below, apply equally no matter which definition is adopted.  (Tr. 122:15-123:6, 325:2-12.)

### E.     Summary of Findings

14.     Hospira presented the expert testimony of Dr. Rodolfo Pinal, who received a Ph.D. in Pharmaceutical Sciences from the University of Arizona in 1988.  (JTX305-0005.)  His Ph.D. research was on solubility and solubilization of drugs, including for parenteral solutions.  (Tr. 318:17-24.)  A parenteral product is a pharmaceutical product that is designed to be administered by injection to the patient.  (Tr. 318:25-319:2.)

15.     Dr. Pinal has practical parenteral experience.  He worked at Roche from 1990-2003 as a formulator of pharmaceutical products, including parenterals.  (JTX305-0003-0004.)  As Associate Professor in Industrial and Physical Pharmacy at Purdue University, he researches and teaches on parenteral formulations, including vitamin D compounds.  (Tr. 319:3-320:11.)  Dr. Pinal has numerous publications and lectures on solubility and co-solvency.  (JTX305-0007-0015.)  In contrast, Plaintiffs' expert Dr. Moreton had no practical experience with co-solvents because he had not employed a co-solvent system for injectables as of April 1998 when the '799 patent was filed and he still has no publications on injectables.  (Tr. 171:23-172:21.)

16.     Dr. Pinal presented credible testimony on noninfringement and invalidity.  As an expert on pharmaceutical sciences, he has knowledge of microbiology and pharmaceutical preservation.  (Tr. 442:21-24.)  Based on his testimony and all of the evidence, the asserted claims are invalid and also would not be infringed by the marketing of Hospira's NDA product.

17.     As Dr. Pinal explained, under the plain and ordinary meaning of the term "about," Hospira's 40/10 formulation is not within the claimed ranges.  (Tr. 326:13-19.)  Hospira's formulation was also excluded from the claimed ranges during prosecution, when AbbVie amended the claims in response to rejections from the Patent Office.  (Tr. 339:4-340:6.)  Dr. Moreton offered no opinion on the plain and ordinary meaning of the word "about" (*see* Tr. 190:11-16 ("I haven't given that opinion, no")) and confirmed the prosecution history.

18.     The prior art '925 and '957 patents taught that vitamin D compounds could be administered parenterally using common pharmaceutical solvents.  (JTX034-0005 at col. 8:23-27; DTX355 at col. 2:24-29.)  The prior art also taught that ethanol and propylene glycol were the most common co-solvents used in FDA-approved parenteral products.  (Tr. 371:9-13.)  As explained by Dr. Pinal, a skilled formulator would use simple, routine techniques to optimize the co-solvent systems for paricalcitol.  To obtain allowance of the claims, AbbVie asserted that the claimed co-solvents demonstrated an unexpected "synergistic" antimicrobial effect.  (Tr. 340:16-21.)  These results were established using a flawed test methodology and were never demonstrated for the 40/10 formulation.  (Tr. 383:4-11, 395:7-11.)  Thus, the asserted claims would have been obvious, and no secondary considerations, including the flawed "synergistic" results, support non-obviousness.

## II.     HOSPIRA'S NDA PRODUCT DOES NOT INFRINGE THE ASSERTED CLAIMS

### A.     Under the Plain and Ordinary Meaning of "About," Hospira's Product Does Not Have the Claimed Ranges of Co-Solvents

19.     The terms "about 15% to about 30%" ethanol and "about 20% to about 35%" propylene glycol were construed by the Court to have their plain and ordinary meaning to skilled formulators.  (DTX341.)  Dr. Pinal applied this construction in his infringement and validity analysis.  (Tr. 323:9-324:1, 450:8-19, 474:6-24.)  In contrast, Dr. Moreton's testimony was not

helpful to the Court—he simply said that "about is about" and provided no opinion on what that word means in its plain and ordinary sense to a pharmaceutical formulator.  (Tr. 190:7-16.)

20.     Hospira's NDA product contains 40% ethanol and 10% propylene glycol (v/v). (Stip. ¶ 17.)  Hospira's formulation is outside the scope of the claims.  (Tr. 341:20-342:17; Giles II Tr. 69:13-71:8.)  Simply put, Hospira's 40% ethanol does not fall within the range of "about 15% to about 30%" and Hospira's 10% propylene glycol does not fall within the range of "about 20% to about 35%."  (Tr. 342:19-23.)

21.     The use of the term "about" does not extend so far to cover the 10-percentage point difference between Hospira's product and the outer limits of the ranges specified in the claims.  (Tr. 342:24-343:3.)  As Dr. Pinal explained, the use of the word "about" to a skilled formulator "would not stretch that much."  (Tr. 343:2-3.)  In contrast to Dr. Pinal's explanation of how the term "about" is used by a skilled formulator, Dr. Moreton offered no opinion on the plain and ordinary meaning of "about" to a skilled formulator.  (Tr. 190:7-16.)

22.     The word "about" is a context-sensitive word that is commonly used by skilled formulators to facilitate technical communications.  (Tr. 343:4-14.)  When conducting research, one of the key objectives is to prepare different and distinct formulations to determine the composition of choice.  (Tr. 343:15-19, 344:10-15.)  The word "about" allows the formulator to refer to multiple copies of formulations that have the same target range of ingredients.

23.     For example, if a skilled formulator wishes to compare a 20% ethanol formulation to a 25% ethanol formulation, the formulator may make 10 copies of each formulation.  Because it is unlikely that any two copies each formulation are going to have exactly the same concentration of ethanol, the skilled formulator uses the term "about" when referring to the

copies.  That is, all of the 20% targeted formulations are "about" the same, and all of the 25% targeted formulations are "about" the same.  (Tr. 343:20-344:9.)

24.     This ordinary meaning of the term "about" is consistent with the '799 patent specification.  (Tr. 344:16-20.)  Table 1 shows target and actual values of formulations:

| Ethanol | Propylene glycol | Water | Percalcitol [sic] (µg/ml) |
|---------|------------------|-------|---------------------------|
| 0.00    | 0.506            | 0.494 | 14.21                     |
| 0.00    | 0.302            | 0.698 | 0.58                      |
| 0.100   | 0.257            | 0.643 | 2.88                      |
| 0.199   | 0.207            | 0.594 | 15.94                     |
| 0.201   | 0.308            | 0.491 | 72.90                     |
| 0.299   | 0.00             | 0.701 | 6.82                      |
| 0.347   | 0.102            | 0.551 | 119.37                    |
| 0.498   | 0.00             | 0.502 | 601.63                    |

(JTX002-0008 at col. 5:17-28; *see also* Tr. 328:17-329:16.)

25.     Looking at the ethanol column, the third row is exactly "0.100," indicating that the formulators targeted the value of 10% and hit it perfectly.  (Tr. 345:2-11.)  But as shown in every other row, the actual value is not exactly the same as the target.  The next row is "0.199," which was a target value of 20%.  The next rows target 20% again, then 30%, then 35%, then finally 50%.  (Tr. 345:12-17.)  All of the actual values are different from the targets.  That is consistent with the plain and ordinary meaning of the term "about," but does not mean that the variation should be limited to one percent.  (Tr. 345:18-23.)

26.     The target values of experimental formulations in the patent are consistently described in 5% increments of organic solvents.  These experiments demonstrate that, at most, "about 30%" ethanol can encompass minor deviations on either side of 30%.  As shown in Table 1, 35% could not be considered "about 30%" in the plain and ordinary meaning of the term because in this experiment both 35% and 30% are target values for the concentration of ethanol.

Because the objective is to compare the two target formulations, the term "about" would

"backfire" and confuse communications if it was read that broadly.  (Tr. 346:17-25.)  Similarly,

40% cannot be "about 30%."  As shown in Table 1, 30% and 35% are discrete target values, and

40% would be a different target from both of those.  (Tr. 347:9-12.)

     27.     Therefore, in light of the plain and ordinary meaning of the term "about," which

confirmed by the context of the '799 patent specification, Hospira's NDA product cannot

infringe the asserted claims because it does not contain "about 15% to about 30%" ethanol or

"about 20% to about 35%" propylene glycol.  (Tr. 326:13-19.)

     28.     The conclusion on non-infringement is not changed by Hospira's product release

specifications of ±4.  (Tr. 348:14-350:9.)  As Dr. Pinal explained, the term "about" does not

provide a sharp boundary to the claimed ranges.  (Tr. 349:1-7.)  This is shown below.



     29.     As Dr. Pinal explained, the release specifications have nothing to do with the

word "about" and have extremely sharp boundaries.  If something is inside the specification, it

passes.  If it is outside the specification, it does not—there is no "about."  (Tr. 349:18-350:4.)

Even if Hospira released a product with 36% ethanol, it would not infringe under the plain and

ordinary meaning of the term "about."  (Tr. 376:24-377:3, 463:10-23.)

**B.     The Prosecution History Confirms That Hospira's Formulation Was Excluded During Prosecution**

30.     Dr. Pinal reviewed and testified about the prosecution history of the '799 patent. (JTX005; Tr. 333:9-15.)   In contrast, Dr. Moreton reviewed the prosecution history but did not explain it during his direct testimony.  (Tr. 174:18-25.)

31.     As originally filed, claim 1 had a wide scope and covered all five of the formulations tested in Example 3.  The claim did not contain any limit on the amount of co-solvents.  It covered any therapeutic agent and any concentration of organic solvent from 0 to 100%.  (Tr. 333:13-335:5; *see also* Tr. 175:9-176:16.)

32.     The patent examiner rejected all of the original claims and, in response, the applicants amended the claims.  (JTX005-0241; Tr. 335:6-17, 176:20-177:7.)   In Amendment A, the applicants amended claim 1 to require a sterilized, self-preserved, aqueous pharmaceutical composition and parenteral administration.  (Tr. 335:16-336:10.)  As Dr. Pinal explained, they replaced "comprising" with "consisting essentially of," which refers to the potential presence of other excipients that do not materially affect the novelty and the basic nature of the invention. (Tr. 336:11-16.)  The applicants narrowed the term "therapeutic agent" to "vitamin D compound."  (Tr. 355:20-336:10.)  They also required "about 50 percent volume by volume of an organic" and "about 50 percent of water."  (*Id*.; *see also* Tr. 177:5-178:6.)  Indeed, it was not necessary to include ethanol and propylene glycol for a formulation to be covered by the claims. (Tr. 178:7-10.)  At this point, the 40/10 formulation was still within the scope of the claims.  (Tr. 336:17-337:9, 178:13-19.)

33.     When submitting Amendment A, the applicants argued that unexpected synergistic antimicrobial results entitled them to a patent.  (JTX005-244; Tr. 337:1-24.)   As evidence, they cited to all six of the Figures in Example 3.  (Tr. 337:25-338:4, 180:7-181:7.)

34.     The examiner again rejected all of the claims and, in response, the applicants again narrowed the claims in Amendment B.  (JTX005-0307; Tr. 338:18-339:3, 181:8-23.) Amendment B narrowed the range of concentrations for the organic solvent.  (Tr. 339:4-24; JTX005-0307-08.)  The level of alcohol was changed to "about 15% to about 30%" and the level of glycol was changed to "about 20% to about 35%."  (Tr. 339:9-24.)  The 40/10 formulation was no longer within the scope of the claims after Amendment B.  (Tr. 339:25-340:6.)

35.     The applicants again submitted evidence of alleged unexpected "synergistic" results.  (JTX005-0310.)  As evidence, they cited Figures 1 to 5.  They no longer included Figure 6 (the 40/10 formulation) because it was not within the ranges specified after the second amendment.  (Tr. 340:10-341:7, 182:7-23, 184:15-185:5.)

36.     This signifies that, when Amendment B was made, the applicants knew that a formulation with 40% ethanol and 10% propylene glycol no longer fell within the scope of the claims, despite the claims using the term "about."  (Tr. 341:8-14.)  After this amendment and argument, the claims were allowed.  (Tr. 341:17-19.)  This confirms that Hospira's 40/10 formulation was excluded during prosecution and does not infringe the claims.

### C.     Plaintiffs' Additional Evidence Does Not Establish Infringement

37.     Despite the plain and ordinary meaning of the term "about" and the clear prosecution history, Plaintiffs assert that Hospira's product infringes based on communications between Hospira and a potential customer and the FDA.  (Tr. 127:14-23.)

38.     Hospira's communications with DaVita do not establish infringement.  DaVita is a dialysis company that is concerned with product safety and efficacy.  (Tr. 468:3-15.)  Hospira's statements to DaVita were focused on the performance of Hospira's NDA product, not its composition, and do not affect the noninfringement analysis.  (Tr. 350:10-20, 474:25-475:21.)

01:14611030.1

Those communications demonstrate that Hospira's product has differences in composition from Zemplar, but not different pharmacological effects.  (Tr. 468:16-24.)

39.     Similarly, the FDA communications do not establish infringement.  The FDA's primary concern in all communications is safety and efficacy, which relate to the performance of a product.  (Tr. 350:21-351:4.)  The FDA is interested in the composition of a formulation, but only to the extent it impacts safety and efficacy.  Changes to a formulation are considered minor where they do not alter the safety or efficacy of the product.  (*Id.*, 468:4-15.)

40.     Whether Hospira's product is self-preserved also does not establish infringement.  (Tr. 351:5-10.)  The self-preserved claim limitation is separate and distinct from the concentrations of the co-solvents.  Evidence that a product meets one claim limitation (*i.e.*, self-preservation) has no bearing on whether the product meets the ranges of co-solvents specified in a different claim limitations.  (Tr. 351:11-15.)

41.     In addition, as Dr. Moreton testified, bioequivalence and infringement are two different inquiries with separate standards.  (Tr. 188:19-24.)  There could be self-preserved, bioequivalent formulations that fall outside the '799 patent claims.  (Tr. 188:25-190:6.)

42.     Finally, the last sentence of Example 3, which says that "Figs. 5 and 6 demonstrate that the ratio of ethanol and PG is not critical to the self-preserving properties of this cosolvent formulation," does not establish infringement.  (JTX002-0008.)  This sentence says that the ratio of the co-solvents makes no difference in terms of microbial preservation.  (Tr. 351:16-352:2.)  That has nothing to do with identifying what ranges are outside of the claims as amended or the meaning of the term "about."  (Tr. 352:3-4.)

43.     In sum, in light of all the evidence, Hospira's product does not fall within the claimed ranges of co-solvents and thus does not infringe any of the asserted claims.

III.     **KNOWLEDGE OF A SKILLED FORMULATOR RELEVANT TO THE VALIDITY ANALYSIS**

A.     **Background on Co-Solvents**

44.     For decades, vitamin D has been known as a highly hydrophobic or lipophilic, poorly water-soluble compound.  (Tr. 376:4-9, 377:15-20.)  A skilled formulator at the time of filing the '799 patent would have known that vitamin D and its analogs, including paricalcitol and calcitriol, would require a solubilization approach.  (Tr. 372:4-13.)

45.     Co-solvents and surfactants were two of the most common solubilization techniques for hydrophobic, poorly-water soluble drugs in 1997.  (Tr. 199:1-5, 352:7-17.)  Co-solvency is commonly used to increase the solubility of poorly soluble drugs for parenteral formulations.  (Tr. 352:7-17.)  Co-solvency is generally used when a purely aqueous vehicle cannot achieve the desired solubility or stability for a potential formulation.  (Tr. 352:18-353:18.)

46.     As of 1997, a skilled formulator would have understood that vitamin D analogs can be solubilized with co-solvents or surfactants and would likely test both approaches.  (Tr. 355:11-17.)  A skilled formulator would have expected advantages to using co-solvency with compounds like paricalcitol, including to prevent loss of the active ingredient to the containers or tubing and to prevent oxidation, a known problem for vitamin D analogs that used surfactants, including Calcijex.  (Tr. 354:6-25, 355:18-24, 407:5-14; Stephens Tr. 80:24-81:9.)

47.     Consistent with the practice of skilled formulators as of 1997, during its research and development, AbbVie only attempted those two approaches to solubilize paricalcitol.  The only co-solvents tested by AbbVie were ethanol and propylene glycol, and the only surfactant AbbVie considered was Tween 20.  (Pec Tr. 44:2-45:10.)

48.     Once a skilled formulator decided to investigate co-solvency, simple routine experimentation would have led the skilled formulator to select the appropriate type and amounts

of co-solvents. (Tr. 356:8-357:18.) First, a skilled formulator would select the appropriate co-solvents. (Tr. 356:8-20.) At the time, only five co-solvents had been employed in FDA pharmaceutical formulations, and of those five only three were used on a regular basis. (JTX031-005; JTX032-005; Tr. 356:17-20.) Of these, ethanol and propylene glycol were the most common co-solvents. (Tr. 362:4-363:12; JTX031-0005; JTX032-0007.) When selecting an injectable formulation, a skilled formulator prefers to use known solvents in the same amounts that had already been employed in FDA-approved formulations. (Tr. 403:24-404:16.)

49. To develop a co-solvent system, a skilled formulator would routinely start by testing the solubility of drug in different levels of total organic co-solvent load (*i.e.*, the total percent of organic solvent(s) in the vehicle) for the potential formulation. (Tr. 356:21-357:7.) This would be accomplished by performing a common, routine solubility experiment, which consists of making and testing different total organic loads and determining the concentrations of the drug dissolved in the organic solvent. (*Id*.)

50. A skilled formulator would routinely test each individual co-solvent at the specified total load, as well as combinations of co-solvents at varying concentrations that together equal the total load being targeted. (Tr. 357:8-18.)

51. This routine testing would be done until acceptable solubilization and stability were achieved. (Tr. 356:21-357:18.) As a general matter, there are likely to be multiple combinations of ranges that would provide acceptable solubility. (Tr. 358:3-10.) Indeed, Dr. Moreton confirmed that this process was known and routinely practiced before the '799 patent was filed. (Tr. 247:17-248:9.) This process is illustrated below:



52.     After selecting an appropriate co-solvent system, a skilled formulator would

consider whether the product is going to be multi-use or single-use. (Tr. 357:19-358:2.) For a

multi-use product, the skilled formulator would determine whether the formulation was self-

preserved or needed an additional preservative. (*Id*.) To be considered self-preserved, a

formulation would need to pass the USP preservative effectiveness test. (Tr. 103:3-7.) For a

single-use product, the skilled formulator is not permitted to add a dedicated preservative without

obtaining a multi-use label, because the product is meant to be used once and then discarded.

(Tr. 358:22-359:1, 418:5-11.)

53.     Having antimicrobial components in a formulation does not preclude the addition

of an antimicrobial agent, provided that the agent is placed in there for that specific purpose. (Tr.

427:10-16.) A skilled formulator is allowed to add an additional antimicrobial agent if other

ingredients have antimicrobial properties but are there for other reasons, such as to make the

drug soluble. (Tr. 471:1-472:9.) Simply because a formulation, such as Valium, adds a

preservative does not mean that the formulation is not otherwise self-preserved. (Tr. 472:10-23.)

### B.    Known Antimicrobial Properties of the Claimed Co-Solvents

54.    A skilled formulator would have expected that ethanol and propylene glycol would be self-preserving at the claimed concentrations.  (Tr. 371:18-23.)  Ethanol was known as a preservative in 1997.  (Tr. 359:9-12.)  Ethanol was known to be most useful as a preservative where it was also being used as a solvent.  (Tr. 233:20-23.)  The typical concentration for preservation was greater than 20%.  (Tr. 233:24-234:1, 360:12-21; JTX035-0015.)

55.    Propylene glycol was also known to have antimicrobial properties by 1997.  (Tr. 361:3-11.)  Indeed, propylene glycol was known to share the antimicrobial and solvent properties of ethanol.  (Tr. 361:3-8.)  It was typically employed as a preservative at a concentration between 15% and 30% and it was used as the only preservative at concentrations above 20%.  (Tr. 235:6-13, 360:24-361:11; JTX035-0015.)

### C.    Prior Art Co-Solvent Formulations

56.    The prior art Nema reference taught that, prior to 1997, ethanol had been employed as a solvent in 24 FDA-approved formulations in concentrations ranging from .6% to 80%.  (Tr. 205:8-10; JTX031-0005.)  Similarly, propylene glycol had been employed in 25 FDA-approved formulations in concentrations ranging from .2% to 75.2%.  (Tr. 362:10-24; JTX031-0005.)  Ethanol and propylene glycol had been used either alone or together in greater than 50% of parenteral co-solvent systems.  (Tr. 202:12-16, 363:7-12; JTX031-0005.)

57.    The prior art Sweetana reference identified co-solvency as one of the "simple approaches" to solve solubility problems.  (Tr. 363:25-364:6, 366:20-25; JTX032-0003).  Ethanol and propylene glycol were two co-solvents to use with this approach.  (Tr. 364:12-18.)  Co-solvents were employed in 10% of all FDA-approved parenteral formulations.  (JTX032-0005.)  This number is significant because many formulations are formulated in aqueous systems that do not require any special technique to solubilize the drug.  (Tr. 365:12-20.)  While

Sweetana states that preparing formulations of poorly water soluble drugs can sometimes be a "formidable task," Dr. Pinal testified that is not always the case and it is not a formidable task for vitamin D analogs.  (JTX032-0013; Tr. 364:19-365:8.)

58.   Sweetana contained a list of marketed products that used co-solvents.  (JTX032-007.)  Eight out of the 16 formulations used a co-solvent system consisting of ethanol, propylene glycol, and water.  (Tr. 365:24-366:11.)  Further six of those eight formulations contained a total of 50% organic solvent and 50% water.  (*Id.*)  Sweetana lists a product called Brevibloc that contained 25% ethanol and 25% propylene glycol. (Tr. 366:12-19.)  Dr. Pinal properly considered the Brevibloc prior art because the asserted claims require a parenteral formulation, which includes injectable products that must be diluted prior to administration.  (Tr. 377:4-12.)

59.   Dr. Moreton provided inconsistent testimony on what it means to be a parenteral product.  During direct examination he testified that a parenteral is "anything that avoids the gastrointestinal tract.  It is generally taken to be an injectable formulation."  (Tr. 89:13-16.)  Then, when discussing Brevibloc, he asserted that "a concentrate that has to be diluted before use" is "not a parenteral formulation because it cannot be directly injected into the body."  (Tr. 199:21-200:9.)  This is inconsistent with Sweetana, which lists Brevibloc in a table entitled "Cosolvent Concentrations in Some Currently Marketed Parenterals."  (JTX032-0007.)  This is also inconsistent with his infringement opinion because Hospira's product has a warning that it cannot be directly administered to a patient.  (Tr. 200:17-20; JTX204-0001-0002.)  He acknowledged that Hospira's product "cannot be administered directly into the vein" but testified that it "can be administered directly into the blood" in the return from the dialysis machine.  (Tr. 200:10-16.)  He finally admitted that "[p]arenteral products are going to be the ones that are going to be administered through the skin."  (Tr. 221:10-12.)  That is not how Hospira's product

is administered.  The inconsistencies in Dr. Moreton's testimony between infringement and

invalidity are not credible and render his opinions unhelpful to the Court.

## IV.   THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS OVER THE '925 PATENT IN LIGHT OF THE CALCIJEX LABEL AND THE KNOWLEDGE OF SKILLED FORMULATORS

60.     The '925 patent discloses sterilized vitamin D formulations.  (JTX034-0005 at

col. 8:23-25.)  The '925 patent is directed towards a method of treatment with a therapeutically

effective amount of paricalcitol.  (Tr. 370:8-13; JTX034-0005 at col. 7:63-65, 8:39-43; JTX034-

0007 at claim 1).  The '925 patent teaches that the disclosed active ingredients can be formulated

for intravenous or parenteral use.  (Tr. 369:24-370:9, 193:25-194:2; JTX034-0005 col. 8:23-25;

JTX034-0007 at claim 1.)  Indeed, the patent discloses placing the compounds into solutions of

pharmaceutically acceptable solvents and that the solutions can be formulated "according to

conventional methods known in the art." (JTX034-0005 at col. 8:10-15.)

61.     The '925 patent expressly discloses the "sterilized, aqueous, pharmaceutical

composition for parenteral administration," and "therapeutically effective amount" limitations of

claim 7.  (Tr. 370:17-21.)

62.     A skilled formulator would conduct only routine solubility testing to properly

follow the suggestion in the '925 patent to place these vitamin D compounds into a vehicle for

parenteral therapeutic administration using a co-solvent system in the ranges recited in claim 7 of

the '799 patent.  (Tr. 370:23-371:17.)  Ethanol and propylene glycol were, at the time, the two

most commonly used co-solvents and the first two choices that a skilled formulator would test.

(Tr. 371:9-13.)  A skilled formulator would arrive at the claimed ranges of about 15% to about

30% ethanol and about 20% to about 35% propylene glycol through routine experimentation.

(Tr. 370:23-371:8.)  Indeed, the routine nature of this work was emphasized by the examiner

during prosecution of the '799 patent.  (JTX005-0083 ("different proportion and mixing steps of

each ingredients" are "routine practice").)  Further, a skilled formulator would have expected that ethanol and propylene glycol in those ranges would be self-preserved.  (Tr. 371:14-23.)

63.     A skilled formulator in 1997 would have been motivated to dissolve paricalcitol in ethanol and propylene glycol and would have had a reasonable expectation of success in doing so.  (Tr. 372:2-13.)  A skilled formulator would have expected that a hydrophobic vitamin D compound like paricalcitol could be dissolved in the claimed co-solvents.  (Tr. 372:14-21.)  Co-solvency is a powerful technique for solubilizing hydrophobic compounds and thus it would have been obvious to solubilize paricalcitol in an organic co-solvent system for parenteral administration.  (Tr. 372:2-21.)

64.     The deposition testimony of the named inventors confirms that this common approach would be employed by skilled formulators when solubilizing the vitamin D compounds of the '925 patent.  Dr. Edward Pec testified that the reason a co-solvent system of ethanol and propylene glycol was used with paricalcitol was that it was a "technique that was defined out of the pharmaceutical textbook" and agreed that "ethanol and propylene glycol are commonly used organic solvents."  (Pec Tr. 87:2-5, 42:17-43:2, 159:1-10; *see also* Stephens Tr. 244:22-245:4.)

65.     Claims 8 and 9 specify the amount of the vitamin D in the composition.  Claim 8 specifies that the vitamin D compound is present between about 2 µg/ml and about 10 µg/ml.  (Tr. 197:25-198:3.)  Claim 9 specifies that the compound is present at about 5 µg/ml, which is squarely within the range of claim 8.  (Tr. 198:8-10.)  These limitations on the amount of vitamin D compound would have been obvious over the prior art.  (Tr. 368:15-21.)

66.     The '925 patent discloses the use of about 1 µg to about 500 µg of vitamin D per day.  (JTX034-0007 at claim 1; Tr. 194:13-16.)  The Calcijex label discloses that a 2 µg/ml formulation of calcitriol, one of the claimed compounds, was commercially available.  (Tr.

198:4-7; JTX254-0003.)  It would have been obvious to a skilled formulator to choose the amount of vitamin D in claims 8 or 9 based upon finding a safe and therapeutically effective amount.  A skilled formulator would have expected that, because paricalcitol and calcitriol are analogs with similar properties, their doses would be of the same order of magnitude.  (Tr. 373:2-374:6.)  A skilled formulator would be motivated to look to the dosage in Calcijex as a starting point for paricalcitol and would have arrived at concentrations in the range of about 2 to about 10 μg/ml and about 5 μg/ml.  (Tr. 374:7-375:2.)

68.     AbbVie did not present any evidence that the amounts of vitamin D in claims 8 and 9 are special or unexpected.  While Dr. Moreton presented direct testimony on the alleged infringement of claims 8 and 9, he did not provide any direct testimony on the non-obviousness of those claims beyond his testimony on claim 7.  On cross examination, he admitted that the '925 patent provides a dosage range that can be adjusted based on the disease to be treated (Tr. 194:10-19) and that the Calcijex label says that most hemodialysis patients receive a dose of 0.5 to 3.0 μg three times per week (Tr. 195:24-196:12).  He also admitted that the 2 μg/ml concentration of claim 8 was specifically used in the Calcijex commercial product, and that the 5 μg/mL limitation if claim 9 is squarely within the range of claim 8.  (Tr. 197:25-198:10.)

## V.    THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS OVER THE '957 PATENT IN LIGHT OF THE '925 PATENT OR MALLUCHE AND THE KNOWLEDGE OF SKILLED FORMULATORS

68.     The asserted claims would have been obvious over the '957 patent (DTX355) in combination with the prosecution history of the '925 patent (JTX287-0001) or Malluche (DTX346 at 754) and the knowledge of a skilled formulator at the time of the invention.

69.     The '957 patent discloses co-solvent systems containing therapeutically effective amounts of vitamin D compounds.  (Tr. 243:9-25, 378:9-14.)  While the examples primarily relate to oral formulations, the '957 patent also discloses formulations for parenteral use that

consist of a combination of "sterile pyrogen-free water, sterile peroxide-free ethyl oleate, dehydrated alcohol, propylene glycol or a dehydrated alcohol/propylene glycol mixture."  (Tr. 238:6-9, 375:13-22; DTX355 at col. 2:24-31.)  Advantageous dosage amounts of the vitamin D compound—0.02 to 20 µg—are disclosed for parenteral use in "therapeutic applications." (DTX355 at col. 2:31-42.)

70.     A skilled formulator would have understood that the '957 patent provides a "laundry list" of solvents and combinations that can be used to solubilize vitamin D compounds for injection.  (Tr. 375:23-376:3.)  In 1997, a skilled formulator would have known that a Vitamin D analog cannot be dissolved in water because vitamin D is lipophilic.  (Tr. 376:4-9.)

71.     The '957 patent expressly discloses the sterilized, aqueous, parenteral, and pharmaceutical composition limitations of claim 7.  (Tr. 378:8-17.)  The '957 patent also discloses co-solvents comprised of ethanol and propylene glycol.  (Tr. 375:10-22.)

72.     A skilled formulator would have interpreted the list of solvents disclosed in the '957 patent to include combinations of ethanol and propylene glycol with water.  A skilled formulator would understand that ethanol and propylene glycol in combination can dissolve the active ingredient, but if the formulation were going to be administered intravenously it would be necessary to add water because a parenteral product needs to be aqueous.  (Tr. 377:21-378:7.) Dr. Moreton confirmed that a skilled formulator would not administer a vitamin D compound parenterally in a dehydrated alcohol/propylene glycol mixture, emphasizing that "I wouldn't, no" and "I would hope they wouldn't."  (Tr. 241:5-12.).

73.     A skilled formulator would have expected that the solvents identified in the '957 patent could be used with calcitriol or paricalcitol because a formulator looks for information on compounds that have some commonality with the compound of interest.  Paricalcitol is a vitamin

D analog, so a skilled formulator would look for information on vitamin D analogs like the ones in the '957 patent.  (Tr. 378:18-25.)

74.    Further, the '925 patent file history (JTX287-0105) and Malluche (DTX346 at 755) teach that paricalcitol and calcitriol were soluble in combinations of ethanol and propylene glycol.  (Tr. 380:9-12.)  A skilled formulator would have been motivated to use paricalcitol or calcitriol in the formulations described in the '957 patent.  (Tr. 379:1-380:16.)

75.    The selection of the specific ranges disclosed in claim 7 of the '799 patent is just a matter of routine experimentation for a skilled formulator.  (Tr. 380:20-381:6.)  As described above in Section III.A, the use of those two co-solvents in those combinations would have been something that the skilled formulator would have arrived at as part of routine work to optimize the formulation.  (*Id*.)  A skilled formulator would routinely test different levels and different combinations of co-solvents in a simple solubility experiment to arrive at an acceptable formulation.  (*Id*.)  Consistent with the approach a skilled formulator would take, AbbVie took this approach and carried out only a few simple solubility experiments to arrive at the Zemplar formulation.  (Li Tr. 37:8-17; JTX053-0056-67, 0070-79; JTX055-035-45; JTX058-0006-31.)

76.    A skilled formulator also would have reasonably expected that a formulation containing the ranges of solvents recited in claim 7 of the '799 patent would be self-preserved, as the antimicrobial properties of both components were known.  (Tr. 381:7-14.)

77.    Claim 8 specifies that the vitamin D compound is present between about 2 µg/ml and about 10 µg/ml. (Tr. 197:25-198:3.)  Claim 9 specifies that the compound is present at about 5 µg/ml, which is squarely within the range of claim 8.  (Tr. 198:8-10.)  These limitations on the amount of vitamin D compound would have been obvious over the prior art.  (Tr. 368:22-369:1.)

78.     The '957 patent discloses that an advantageous amount of vitamin D is a dosage unit of 0.02 to 200 µg, preferably 0.02 to 20 µg.  (DTX355 at col. 2:31-36.)  It would have been obvious to a skilled formulator to choose the specific amounts of vitamin D in claims 8 and 9, as they are within the disclosed range in the '957 patent.  (Tr. 382:5-15.)  As noted above, AbbVie presented no evidence on the non-obviousness of these claimed concentrations of vitamin D.  On cross examination, Dr. Moreton admitted that the '957 patent describes doses in the range of .02 to 200 µg and .02 to 5 µg, with 5 to 50 µg being used in some therapeutic applications.  (Tr. 243:1-25.)  He admitted that this is "just the normal dosage for human treatment" and would be useful for parenteral administration.  (Tr. 244:5-18.)  Thus, all of the asserted claims would have been obvious over the '957 patent, the prosecution history of the '925 patent or Malluche, and the knowledge of a skilled formulator.  (Tr. 382:16-20.)

VI.     **SECONDARY CONSIDERATIONS DO NOT SUPPORT NON-OBVIOUSNESS**

A.     **Plaintiffs' Evidence of Unexpected Results Is Flawed and Not Commensurate in Scope with the Claims**

79.     During prosecution, AbbVie overcame prior art rejections by relying on the allegedly unexpected "synergistic" effect of using ethanol and propylene glycol to achieve a preservative effect that is greater than the sum of the individual co-solvents.  This evidence of unexpected results provides no support for non-obviousness.

80.     The applicants followed the USP 23 preservative effectiveness test using a solution containing 20% ethanol and 80% water (Fig. 1) and a separate solution containing 30% propylene glycol and 70% water (Fig. 2).  (JTX002-0006 at col. 2:12-15.)  Each of those solutions had significantly less than 50% organic solvent. The applicants added the results of the experiment in Figure 1 to the results of the experiment in Figure 2 to create the prediction in Figure 3.  (Tr. 383:12-20; JTX002-0008 at col. 5:53-56.)  The applicants then tested a solution

with 20% ethanol, 30% propylene glycol, and 50% water (*i.e.*, 50% organic co-solvent).  The applicants asserted that the actual preservative effect of that solution (Fig. 4) was greater than the "predicted effect."  (JTX002-0008 at col. 5:56-58.)

81.     As a threshold matter on which both experts agree, all of the formulations tested in the '799 patent, including the 20% ethanol / 80% water and the 30% propylene glycol / 70% water in Figures 1 and 2, passed the USP preservative effectiveness test and are sufficiently self-preserved.  (Tr. 332:8-333:6, 106:15-18.)  Indeed, Dr. Moreton admitted that the patent itself states that these results were not entirely unexpected.  (Tr. 229:3-15.)

82.     In addition, the antimicrobial effectiveness testing described in the specification of the '799 patent is flawed because the "predictive" calculation made in Figure 3 of the '799 patent is based on a false premise and thus is misleading in its purported results.  (Tr. 383:4-11.)

83.     As Dr. Pinal explained, microbes need water to survive and multiply.  (Tr. 384:24-385:8.)  "Water activity" ("$A_w$") is a measure of the ability of water to enable microbes to survive and reproduce.  (Tr. 384:11-13.)  The prior art ,including Shibasaki (DTX378 at HOS-PAR062887-91), discussed this concept.  A skilled formulator would look to food sciences for information on preservative efficacy because that is an issue for every food product and that field has the most expertise.  (Tr. 387:18-388:2.)

84.     As Shibasaki explains, "[t]he growth of microorganisms is inhibited by lowering the $A_w$ of the medium and ultimately growth is completely inhibited at a certain $A_w$."  (DTX378 at HOS-PAR062889.)   This means that, with everything else being equal, the more water available for microbes the better they will do.  As the water becomes less and less available to microbes, for whatever reason, it will inhibit their growth and at some point growth will stop.  (Tr. 386:12-387:1, *see also* 255:9-19, 473:18-474:5.)

85.     As Dr. Pinal explained, one can picture this as "bugs" floating around in an amount of water.  (Tr. 384:24-385:13.)  The availability of water in any medium where microbes live provides something like a "living room" for them.  (*Id*.)  As the water becomes less and less available either from removing it or adding something else, the ability of those microbes to survive and multiply is necessarily reduced.  (Tr. 386:20-387:1.)

86.     Indeed, Dr. Moreton confirmed that "you could completely inhibit mold growth **just by reducing the water activity** and you would pass the USP test for mold."  (Tr. 256:18-21 (emphasis added.)  This concept is illustrated below:



87.     The concept of water activity demonstrates why the additive prediction made by the patent applicants is wrong.  They added the values for 20% and 30% organic solvent but did not account for the difference in availability of water.  (Tr. 385:9-13.)   The effect of water activity is significant and was known in the prior art for decades.  (Tr. 385:14-17.)  Dr. Moreton confirmed that the tests of the '799 patent do not account for water activity.  (Tr. 257:12-15.)

88.     In addition, the asserted unexpected results are flawed because they are based on the underlying assumption that the antimicrobial effect of co-solvents would behave in a linear

manner.  (Tr. 392:19-393:2.)  However, it was known prior to filing that antimicrobial activity of co-solvents does not behave in a linear fashion.  (Tr. 391:21-392:3.)  Specifically, the lack of linearity for ethanol and propylene glycol was known in the prior art.  (Tr. 393:3-5.)  A skilled formulator would have known that deviations from a strict linear relationship were expected for the antimicrobial effects of a co-solvent system.  (Tr. 393:23-394:13; DTX377 at HOS-PAR062877-80.)

89.      Moreover, the applicants only attempted to establish an unexpected, synergistic result for one formulation—the 20% ethanol, 30% propylene glycol, and 50% water formulation. Neither the applicants, the patentees, nor Dr. Moreton tested the individual components of the formulation described in Figures 5 and 6.  (Tr. 394:23-395:6.)  Therefore, it is not possible for a skilled formulator to make any conclusions regarding whether Figures 5 or 6 demonstrate any "synergistic" effect.  (Tr. 395:7-11.)

90.      In addition to not testing the underlying components of Figures 5 and 6, the applicants did not test any other combinations that are allegedly covered by claims 7, 8, and 9. Dr. Moreton confirmed that, although you could make many different combinations covered by the claims, the comparison from hypothetical to actual was done for "just one formulation," the 20% ethanol/30% propylene glycol.  (Tr. 258:11-20.)  For all of these reasons, the alleged unexpected results provide no support for non-obviousness of the asserted claims.

**B.      No Other Secondary Considerations Support Non-Obviousness**

91.      Commercial success does not support non-obviousness in this case.  WARF is the owner and AbbVie is the exclusive licensee of the prior art '497 patent, which covers the compound paricalcitol.  (Stip. ¶¶ 25-26, 31.)  The '497 patent prevents market entry for other

companies wishing to sell paricalcitol products until June 2014.[1]  When the '799 patent was filed

in 1998, no other entity had the ability to develop pharmaceutical formulations for paricalcitol.

Whether companies like Hospira are preparing alternative formulations today is irrelevant.

92.     In addition, there is no evidence that Zemplar sales are attributed to the '799

formulation patent rather than the '497 compound patent.  Ms. Coulombe identified numerous

benefits of Zemplar that are described in sales aids.  (PTX455-0001; Tr. 76:17-77:10.)  She

offered no testimony whether any of the benefits related to the '799 patent as opposed to the

prior art '497, '925, or '815 patents covering the compound paricalcitol and methods of using

paricalcitol.  (JTX001-0008; JTX003-0012-13; JTX034-0007; Tr. 78:15-17; 79:12-14; 80:7-9;

81:3-5.)

93.     Moreover, there is no evidence that the self-preserved effect drove sales of

Zemplar because, for all sales up to 2011, Zemplar injection was only available in single-dose

vials, which are not required to be self-preserving because they are only approved for one patient

and must be used once and then thrown away.  (Tr. 66:2-15.)  The self-preserving feature is only

relevant to multi-dose vials.  (Tr. 358:22-359:8; Li Tr. 34:4-19.)  Plaintiffs did not sell multi-

dose vials until 2011.  (Tr. 82:8-10.)  Sales of Zemplar injection started decreasing in 2010 and

have decreased further each year since the multi-dose vial was launched.  (Tr. 81:13-82:18.)

This suggests that the multi-dose vial is not driving sales.  In fact, sales have decreased because

AbbVie lost the DaVita account to Hectorol, a competitor vitamin D product that is sold as a

single-dose vial.  (Tr. 85:9-23.)

---

[1]     This date includes AbbVie's pediatric exclusivity.  *See* Orange Book,
        http://www.accessdata.fda.gov/scripts/Cder/ob/docs/patexclnew.cfm?Appl_No=020819&
        Product_No=001&table1=OB_Rx (last visited Dec. 19, 2013.)

94.     Plaintiffs have not provided any evidence of copying to support non-obviousness. Hospira is not copying the claimed formulation, but submitted a 505(b)(2) NDA with a different formulation than Zemplar injection and the '799 patent.  (Giles II Tr. 66:20-67:7.)  Any copying by other ANDA applicants does not support non-obviousness because the Hatch-Waxman Act framework provides generic companies with incentives to copy already approved drugs.

### PROPOSED CONCLUSIONS OF LAW

**I.      HOSPIRA'S NDA PRODUCT DOES NOT INFRINGE THE ASSERTED CLAIMS**

1.      Hospira incorporates by references the above Proposed Findings of Fact.  If any statement in the Findings of Fact should properly be considered a Conclusion of Law, or vice versa, then such statement shall be considered to be part of the appropriate section.

**A.      Plaintiffs Have Not Met Their Burden of Proving Infringement**

2.      The patent owner has the burden of proving infringement by a preponderance of evidence.  *Takeda Pharm. Co. v. Teva Pharm. USA, Inc.*, 668 F. Supp. 2d 614, 619 (D. Del. 2009); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).  Determining infringement requires a two-step inquiry.  Step one is to construe the disputed terms of the patent at issue; step two is to compare the accused products with the properly construed claims of the patent.  *Alza Corp. v. Andrx Pharm., LLC*, 607 F. Supp. 2d 614, 623 (D. Del. 2009).  Step one is a question of law; step two is a question of fact.  *Id.*; *see also Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009).

3.      Claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  The Court has ruled that the term "about" has its plain and ordinary meaning as understood by a skilled formulator.  Hospira's expert reviewed the Court's order and applied that construction to

his opinions.  In contrast, Plaintiffs presented no evidence of what the plain and ordinary meaning of "about" is to a person of skill in the art.  Hospira's analysis of noninfringement applied the Court's claim construction, while Plaintiffs' analysis did not.

4.      The plain and ordinary meaning of "about" is context-dependent and a skilled formulator utilizes the term so as to avoid rigid numerical boundaries.  *Ortho-McNeil Pharm., Inc, v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326 (Fed. Cir. 2007).  Like all claim terms, "about" should be read in light of its proper stylistic and scientific context.  *Id.*  Courts should also consider how the term is used within the patent and prosecution history, the possible effects of varying its parameters, and extrinsic evidence of meaning and usage.  *Id.*

5.      As explained in detail by Dr. Pinal, the term "about" modifies the range of co-solvents employed in the formulations described in the '799 patent.  A person of ordinary skill in the art would have understood that the term "about" facilitates communications among formulators when they are comparing multiple copies of different target formulations.  While the term about provides some flexibility to account for the fact that no two copies of a target formulation are likely to be the same, it cannot extend to encompass other discrete target formulations.  Dr. Moreton offered no opinion on the plain and ordinary meaning of "about" to a skilled formulator.

6.      For example, a formulator might want to compare concentrations of 40% ethanol, 35% ethanol, and 30% ethanol as target formulations.  A skilled formulator would not use the term "about" so as to blur the lines between those discrete target formulations.  Indeed, if a skilled formulator used the term in this way, it would backfire and confuse communications.

7.      As described in detail in Section II.A of the Proposed Findings of Fact, a skilled formulator would understand that "about" encompasses deviations that occur when preparing

copies of different target formulations, but does not cover multiple discrete target formulations.

The term "about" also cannot extend so far as to cover a 5- or 10-percentage point difference in

co-solvent amounts.  Thus Hospira's 40/10 formulation does not fall within the claimed ranges

and does not infringe any of the asserted claims.  For the same reason, Hospira's product does

not infringe based on its manufacturing specifications of ±4%.  Even if Hospira produced a

product with 36% ethanol or 14% propylene glycol, that product would not meet the claim

limitations because it would not contain "about 15% to about 30%" ethanol or "about 20% to

about 35%" propylene glycol.

8.    Plaintiffs rely on *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351 (Fed. Cir.

2008) for the proposition that the term "about" must be interpreted in the context of the

technology at issue.  That is correct.  Plaintiffs, however, ignore that part of the context here is

that the claims contain numerical limits on the range of co-solvents separate from the other

limitations of the claim.  Plaintiffs, not Hospira, are ignoring the "criticality of the numerical

limitation to the invention" by trying to read those limitations out of the claims entirely.  *Id.* at

1368 (internal brackets omitted).  As that court explained, "[t]o be clear, it is the purpose of the

*limitation* in the claimed invention—not the purpose of the invention itself—that is relevant."  *Id*.

9.    Here, the disputed limitations constrain the amount of co-solvents that are present

in the formulation.  It is irrelevant whether "the ratio of ethanol and PG is not critical to the self-

preserving properties" of the formulation, as stated in the specification.  That has to do with the

self-preserving performance of the formulation, not its numerical composition or other

performance characteristics.  While the ratio of ethanol and propylene glycol may not be critical

to self-preservation, that ratio is critical to determining how much ethanol and propylene glycol

must be present for a formulation to meet the claim terms "about 15% to about 30% (v/v)" or

"about 20% to about 35% (v/v)," particularly since those limitations were added to secure allowance of the claims.  Any other interpretation would vitiate the numerical claim limitations in favor of the self-preserved limitation.

10.     Moreover, even though the plain and ordinary meaning of "about" provides some flexibility, its scope is still limited by the specification and prosecution history.  For example, the Federal Circuit has held that "about 0.040 inch" was not restricted to an upper limit of exactly "0.040 inch" but could not extend to 0.070 inch, either literally or under the doctrine of equivalents, because of actions taken during prosecution.  *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1552, 1555-56 (Fed. Cir. 1996).

### B.     The Prosecution History Confirms That Hospira's Formulation Was Disclosed But Not Claimed

11.     Here, it is undisputed that the scope of the original claims was narrowed during prosecution.  Whether that is considered a "clear disavowal" of claim scope or simply a plain reading of the claims in light of amendments made during prosecution, the result is the same.  The 40/10 formulation was clearly excluded during prosecution.

12.     Prosecution history disclaimer limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.  *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003).  Even disclosed embodiments can be lost if they are not claimed. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008); *see also N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345-46 (Fed. Cir. 2005).  Subject matter can be disavowed during prosecution based on amendments or arguments to the Patent Office, and it is irrelevant whether the applicant had to relinquish a particular interpretation to overcome the prior art.  *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999).

13.     Prosecution history disclaimer "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Biogen Idec, Inc. v. GlaxoSmithKline, LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Members of the public, including competitors, are entitled to rely on the prosecution history. *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000); *see also Biogen*, 713 F.3d at 1095 ("Competitors are entitled to rely on those representations when determining a course of lawful conduct, such as launching a new product or designing-around a patented invention.")

14.     Allowing a patentee to assert infringement against subject matter it disavowed during prosecution "would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies." *Hockerson-Halberstadt*, 222 F.3d at 957.  Where a reasonable competitor would understand that subject matter was disclaimed, a patent holder's later infringement allegation against that subject matter "reduces to a request for a mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning." *Id.*; *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 996 (Fed. Cir. 2003).  Here, Hospira specifically developed a strategy to use an alternative formulation that would not infringe the patent in direct reliance on the final scope of the issued claims.

15.     To the extent there is any ambiguity in claim terms in light of the prosecution history, that ambiguity should be construed against the draftsman, just as it is under the contract doctrine of *contra proferentem*.  *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1336 (Fed. Cir. 2013) (Plager, J., concurring).  As Judge Plager noted, parties and courts in

infringement litigation should not be forced to gaze into a crystal ball to understand the meaning

of the claims when the patent applicant had the "last clear chance" to avoid any ambiguity.  *Id.*

16.     Here, it is particularly inappropriate for Plaintiffs to argue that "about" should

encompass functional equivalents under *literal* infringement, when they could not do so under

the doctrine of equivalents.  A patentee's ability to assert infringement against equivalents can be

foreclosed by actions taken during prosecution.  *Festo Corp. v. Shoketsu Kinzoku Kogyo*

*Kabushiki Co.*, 535 U.S. 722, 733-34 (2002), *remanded to* 344 F.3d 1359 (Fed. Cir. 2003).  A

patent claim cannot be extended "under the doctrine of equivalents to embrace known but

unclaimed subject matter."  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1297 (Fed. Cir. 2009);

*see also Reckitt Benckiser Inc. v. Watson Labs., Inc.*, 430 F. App'x 871, 878 n.2 (Fed. Cir. 2011).

17.     A formulation that is disclosed but not claimed is dedicated to the public and

cannot be accused to infringe under the doctrine of equivalents.  *See Johnson & Johnston Assocs.*

*v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc).

18.     The applicants' addition of numerical ranges to the original claims indicates what

formulations remained within the scope of the claims and what formulations were ultimately

excluded.  The applicants' change of citations to the Figures in the patent during prosecution

demonstrates this as well.  The prosecution history clearly and unmistakably shows that "about

15% to about 30%" ethanol does not encompass Hospira's 40% ethanol and "about 20% to about

35%" propylene glycol does not encompass Hospira's 10% propylene glycol.  That was

confirmed during prosecution when the applicants made Amendment B, which excluded the

40/10 formulation from the claims, and no longer pointed to Figure 6 as an example of the

unexpected results.  Although a 40/10 formulation was originally disclosed and claimed in the

'799 patent, it, like many other formulations, was disclaimed in Amendment B.  Plaintiffs cannot expand the term "about" to capture subject matter surrendered during prosecution.

### C.     Plaintiffs' Additional Evidence Does Not Establish Infringement

19.     Hospira's statements to DaVita and the FDA concerning the performance or bioequivalence of the product are not relevant to whether or not the product meets the limitations regarding the amount of co-solvents required by the claims.

20.     It is well-settled that bioequivalence between an accused product and a patented product does not establish infringement, even under the doctrine of equivalents.  *See Abbott*, 566 F.3d at 1298; *see also Reckitt Benckiser*, 430 F. App'x at 878; *Cephalon, Inc., v. Watson Pharm., Inc.*, 769 F. Supp. 2d 729, 749 (D. Del. 2011).  The Federal Circuit has squarely ruled that "bioequivalency and equivalent infringement are different inquiries" and affirmed summary judgment of non-infringement against Abbott on that very basis.  *Abbott*, 566 F.3d at 1298.  Any Hospira statements concerning the bioequivalence or therapeutic equivalence of its NDA product to Zemplar have no bearing on whether Hospira's NDA product meets the limitations of claims 7 to 9 of the '799 patent.  Hospira's product does not infringe the asserted claims.

## II.     THE '799 PATENT IS INVALID AS OBVIOUS

### A.     The '799 Patent Is Prima Facie Obvious

21.     A patent claim is invalid if "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  Whether a patent claim is obvious is a question of law based on underlying factual determinations including:  (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences, if any, between the prior art and the claimed invention; and (4) secondary considerations of non-obviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).  A patent claiming a combination of

elements from the prior art is obvious if the difference is no more than the predictable use of prior art elements according to their established functions.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).  Moreover, the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  *Id.*

22.     Furthermore, where the general conditions of a claim are disclosed in the prior art, "[i]t is not inventive to discover the optimum or workable ranges by routine experimentation." *Pfizer v. Apotex*, 480 F.3d 1348, 1368 (Fed. Cir. 2007); *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295-96 (Fed. Cir. 2012) (explaining that optimization of result-effective variables is within the ordinary skill in the art); *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 808-09 (Fed. Cir. 1989) (claims to a pharmaceutical composition having a specified ratio of two active agents were obvious over a prior art disclosure of the combination of active agents, because only routine experimentation was required to determine the optimum doses of the agents).

23.     In addition, where claimed ranges overlap with the prior art, *prima facie* obviousness exists.  *See Applied Materials*, 692 F.3d at 1295; *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("A *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art.").  The Federal Circuit recently explained that "where there is a range disclosed in the prior art, and the claimed invention falls within that range," then "the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations."  *Galderma Labs., L.P. v. Tolmar, Inc.*, No. 2013-1034, slip op. at 9 (Fed. Cir. Dec. 11, 2013)

24.       "Obviousness does not require absolute predictability of success," but only "a reasonable expectation of success."  *See Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed. Cir. 2006); *Merck,* 874 F.32d at 809 (explaining that a reasonable expectation of success does not require absolute predictability).  To this end, obviousness "cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."  *Pfizer,* 480 F.3d at 1364.

25.       Here, as discussed in Section IV of the Proposed Findings of Fact, claims 7 to 9 of the '799 patent would have been obvious over the '925 patent in light of the Calcijex label and the knowledge of a skilled formulator as of April 8, 1997.  The '925 patent discloses sterile, injectable formulations of paricalcitol that can be formulated as solutions in pharmaceutically acceptable solvents according to conventional methods.  At that time, ethanol and propylene glycol were the most common co-solvents used in parenteral formulations.

26.       A skilled formulator would have been motivated to select the commonly used co-solvent system of ethanol and propylene glycol to solubilize paricalcitol and would optimize or determine workable ranges for the concentrations of ethanol and propylene glycol to do so.  A skilled formulator would have conducted routine solubility studies to arrive at the claimed ranges, which overlapped with the ranges in other FDA-approved formulations.

27.       A skilled formulator would have expected that the specific ranges of ethanol and propylene glycol would be sufficient to solubilize paricalcitol and would result in an aqueous formulation that is capable of being sterilized.  A skilled formulator would have expected the claimed ranges of ethanol and propylene to be self-preserving.

28.       The '925 patent and the Calcijex label further demonstrated that vitamin D compounds could be prepared for injection in the concentrations recited in claims 8 and 9.

Indeed, the Calcijex label shows that calcitriol, one of the claimed compounds, was commercially available at 2 µg/mL, which overlaps with the range of claim 8.

29.     Similarly, as discussed in Section V of the Proposed Findings of Fact, as of April 8, 1997, the asserted claims would have been obvious over the '957 patent in combination with the prosecution history of the '925 patent or Malluche and the knowledge of a skilled formulator. The '957 patent discloses that vitamin D analogs can be solubilized with ethanol and propylene glycol as co-solvents, alone or in combination with water or other solvents.  A skilled formulator would have been motivated to dissolve paricalcitol in the co-solvent systems taught in the '957 patent because ethanol and propylene glycol had been previously used to solubilize paricalcitol. That was demonstrated in the '925 patent prosecution history and Malluche.

30.     A skilled formulator would have been motivated to modify the disclosure of the '957 patent to obtain a pharmaceutically acceptable formulation of paricalcitol and would have had a reasonable expectation of success in doing so.  A skilled formulator would optimize or determine workable ranges for the concentrations of ethanol and propylene glycol to solubilize paricalcitol.  Indeed, the claimed ranges are within the concentrations of ethanol and propylene glycol in other FDA-approved formulations.  A skilled formulator would have conducted routine testing to arrive at the claimed ranges, and would have expected that the claimed ranges would solubilize paricalcitol and result in a self-preserved aqueous formulation that can be sterilized.

31.     Finally, it would have been obvious for a skilled formulator to prepare paricalcitol for injection in the concentrations specified in claims 8 and 9.  The '957 patent discloses the preparation of vitamin D compounds for injection in dosage units of 0.02 to 20 µg, which are normal doses for human administration.  A skilled formulator would expect that those doses could be dissolved at the claimed concentrations in the co-solvents listed in the '957 patent.

**B.      Unexpected Results Do Not Support Non-Obviousness**

32.     Once a party challenging validity has made a *prima facie* case of obviousness, the

burden of production shifts to the patentee to rebut that showing, typically with secondary

considerations of non-obviousness.  *See Pfizer*, 480 F.3d at 1360; *see also Galderma,* No. 2013-

1034, slip op. at 9; *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353-54

(Fed. Cir. 2013).  Here, regardless of the burden of proof, there are no secondary considerations

that support non-obviousness, particularly not the alleged "synergistic" antimicrobial effects

asserted by Plaintiffs.

33.      Simply demonstrating a greater than additive effect does not necessarily support

non-obviousness.  The patent holder must show that the results were greater than those which

would have been expected to an unobvious extent.  *Ex parte The NutraSweet Co*., No. 91-1067,

1991 Pat. App. LEXIS 18, at *11 (B.P.A.I. 1991); *cf. Wm. Wrigley Jr. Co. v. Cadbury Adams

USA LLC*, 683 F.3d 1356, 1362-63 (Fed. Cir. 2012).

34.     As discussed in Section VI.A of the Proposed Findings of Fact, Plaintiffs' test

methodology is flawed.  Plaintiffs did not control for the significant effect that water activity has

on the antimicrobial nature of formulations.  Plaintiffs' addition of the preservative effects of the

20% ethanol (80% water) formulation with the preservative effects of 30% propylene glycol

(70% water) formulation to create a theoretical predictive formulation was improper.

35.     In addition, a skilled formulator would expect that a formulation that contained

20% ethanol, 30% propylene glycol, and 50% water would have a greater antimicrobial or

preservative effect than the theoretical addition of the preservative effects of formulations

containing each co-solvent individually with the balance water.  First, the difference in water

activity between the actual combined formulation (20% ethanol / 30% propylene glycol) and the

two component formulations would be expected to result in the actual combined formulation

having better preservative effect.  Second, a skilled formulator would have been aware that the antimicrobial activity of ethanol and propylene glycol were not linear and therefore a simple addition of the two was not appropriate.  Thus, contrary to what AbbVie told the Patent Office, the difference between the predicted values (Fig. 3 of the '799 patent) and the actual values (Fig. 4 of the '799 patent) would not be unexpected to a skilled formulator.

36.     Moreover, evidence of unexpected results only supports non-obviousness if it is "commensurate in scope" with the claim.  *In re Grasselli,* 713 F.2d 731, 743 (Fed. Cir. 1983); *see also In re Dill*, 604 F.2d 1356, 1361 (C.C.P.A. 1979); *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *In re Harris*, 409 F.3d 1339, 1343-44 (Fed. Cir. 2005).  It is not sufficient to show that some subset of combinations within the scope of the claim achieved unexpected results, particularly where the claim includes the term "about."  *See In re Peterson*, 315 F.3d at 1330-31 (finding that a showing of improved performance for 2% rhenium is not commensurate with the scope of a claimed range of "about 1-3% rhenium.").

37.     Plaintiffs' alleged unexpected results are improperly limited in scope.  The only formulation for which the applicants can attempt to draw any conclusion on synergy is the 20% ethanol/30% propylene glycol formulation.  No testing was done on 10% propylene glycol, 40% ethanol, 20% propylene glycol, or 30% ethanol individually.  It is thus impossible to draw any conclusions regarding the "synergistic" effects of the formulations in Figures 5 and 6.  Plaintiffs have not established that all formulations that they assert are covered by the claims had the supposed unexpected results, and they certainly have not done so for the 40/10 formulation of Hospira's product.  Because Plaintiffs' unexpected results are not commensurate in scope with the claims, they cannot establish non-obviousness.

### C.     No Other Secondary Considerations Support Non-Obviousness

38.     Although the fact finder is obligated to consider all evidence of secondary

considerations, an expert is not.  *Inline Connection Corp. v. AOL Time Warner Inc.*, Nos. 2-272,

02-477, 2007 U.S. Dist. LEXIS 6207, at *16-17 (D. Del. Jan. 29, 2007).  As it is not the

Defendant's burden to show the absence of all factors, an expert's failure to discuss relevant

secondary considerations goes at most to the weight of his opinion.  *Id.*  In this case, Dr. Pinal

opined on unexpected results, which was the primary secondary consideration asserted by

Plaintiffs and the only one with potential legal relevance in this case.  Dr. Pinal credibly

concluded that Plaintiffs' unexpected results are inadequate to establish non-obviousness.  (*See*

Section VI.A above.)

39.     AbbVie bears the burden of showing commercial success and that the successful

product is the invention disclosed and claimed in the patent.  *J.T. Eaton & Co. v. Atl. Paste &

Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).  Courts have held that commercial success is of

limited value where market entry by others is precluded on the basis of another patent.  *See

Galderma*, No. 2013-1034, slip op. at 14; *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d

1364, 1377 (Fed. Cir. 2005).  Even if the formulation disclosed in the '799 patent would have

been obvious, no entity other than AbbVie had an incentive to use, or could use, that formulation

because market entry was precluded by AbbVie's exclusive license on the '497 compound

patent.  *Id*.  Whether Hospira or other companies develop alternative formulations today is

irrelevant to obviousness at the time the patent was filed in 1998.

40.     In addition, where the active ingredient in a formulation was previously patented,

the commercial success of a product "may heavily derive from subject matter that does not on

the whole contribute to the patentable distinctiveness of the[] claims."  *Syntex (U.S.A.) LLC v.

Apotex, Inc.*, 407 F.3d 1371,1383 (Fed. Cir. 2005).  The alleged commercial success "must be

due to the merits of the claimed invention beyond what was readily available in the prior art." *J.T. Eaton*, 106 F.3d at 1571.  "[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent."  *Galderma*, No. 2013-1034, slip op. at 13.

41.     In this case, the '497 patent claims the paricalcitol compound and AbbVie has not established that sales of Zemplar are driven by benefits of the '799 formulation patent over and above the '497 compound patent.  As explained in Section VI.B of the Proposed Findings of Fact, Ms. Coulombe identified numerous benefits of Zemplar injection, but offered no testimony whether any of those benefits related to the '799 patent as opposed to the '497 patent and the prior art patents that claimed methods of using paricalcitol.  There was no evidence that the self-preserved effect drove sales of Zemplar.

42.     Finally, there is no evidence of copying to support AbbVie's assertion of nonobviousness.  Hospira submitted an NDA with a different formulation than Zemplar injection and the '799 patent.  Any copying by other ANDA applicants does not support non-obviousness because the Hatch-Waxman framework provides generic companies with incentives to copy already approved drugs.  *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 373 (D. Del. 2009); *cf. Galderma*, No. 2013-1034, slip op. at 14 ("The mere fact that generic pharmaceutical companies seek approval to market a generic version of a drug, without more, is not evidence of commercial success that speaks to the non-obviousness of patent claims.")

## III.    CONCLUSION

43.     For the reasons discussed above, the asserted claims would not be infringed by the marketing of Hospira's NDA product and the asserted claims are invalid.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Monté T. Squire*
Melanie K. Sharp (No. 2501)
Monté T. Squire (No. 4764)
Rodney Square
1000 North King Street
Wilmington, DE  19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
msharp@ycst.com

WILLKIE FARR & GALLAGHER LLP
Thomas J. Meloro
Michael W. Johnson
Heather M. Schneider
Sara L. Kapner
Aparnaa B. Saini
787 Seventh Avenue
New York, NY  10019-6099
(212) 728-8000

*Attorneys for Hospira, Inc.*

Dated: December 19, 2013